1  Thomas F. Mazzucco - 306681
        TFMazzucco@mpbf.com
2  Christopher R. Ulrich - 271288
        CUlrich@mpbf.com
3  John P. Girarde - 191518
        JGirarde@mpbf.copm
4  MURPHY, PEARSON, BRADLEY & FEENEY
   580 California Street, Suite 1100
5  San Francisco, CA  94104-1001
   Telephone:      (415) 788-1900
6  Facsimile:      (415) 393-8087

7  David van Leeuwen, Esq.
   Peyrot & Associates, PC.
8  62 William Street, 8th Floor,
   New York, NY 10005
9  Telephone:      (646) 650-2785
   Facsimile:      (646) 650-5109
10        David.vanleeuwen@peyrotlaw.com
   *(Pro Hac Vice Forthcoming)*

11

12  Attorneys for Defendant
    KELEOPS USA, INC.

13

14                      **UNITED STATES DISTRICT COURT**

15            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

16

17  JEFFREY GARON, individually and on behalf      Case No.:
    of all persons similarly situated,
18                                                 **DEFENDANT KELEOPS USA, INC.'S**
                        Plaintiff,                 **NOTICE OF REMOVAL OF CIVIL**
19                                                 **ACTION**
               v.
20                                                 **[28 U.S.C. §§ 1332, 1441 AND 1446]**
    KELEOPS USA, INC.,
21
                        Defendant.
22

23  TO THE CLERK OF THE ABOVE-CAPTIONED COURT:

24          NOTICE IS HEREBY GIVEN that, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, Defendant

25  KELEOPS USA, INC. ("KELEOPS") removes the above-entitled civil action from the Superior Court

26  of the State of California, County of Marin, to the United States District Court for the Northern District

27  of California, based upon diversity of citizenship.

28

DEFENDANT KELEOPS USA, INC.'S NOTICE OF REMOVAL OF CIVIL ACTION

## I.    INTRODUCTION AND FACTUAL BACKGROUND

1.    Pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, and any other applicable authority, KELEOPS hereby gives notice of removal of the above action, *Jeffrey Garon, individually and on behalf of all persons similarly situated v. Keleops USA, Inc.*, Civil Case No. CV0004416, from the Superior Court of the State of California, County of Marin, to the United States District Court for the Northern District of California.  This matter is a class action alleging that KELEOPS violated the California Invasion of Privacy Act ("CIPA"), California Penal Code § 638.50(b).  Plaintiff's First Amended Class Action Complaint alleges that KELEOPS owns and operates a website, https://gizmodo.com (the "Website"), and that when users visit the Website, KELEOPS causes four Trackers - the Steamrail Tracker, AGKN Tracker, and Crowd Control Tracker (collectively, the "Trackers") - to be installed on Website visitors' internet browsers.  Plaintiff alleges that because the Trackers capture Website visitors' "routing, addressing, or signaling information," the Trackers constitute a "pen register" under Section 638.50(b) of the CIPA.

2.    On January 28, 2025, Plaintiff filed this First Amended Class Action Complaint against KELEOPS in the Superior Court of the State of California, County of Marin.  KELEOPS was served with Plaintiff's Summons and First Amended Class Action Complaint on January 31, 2025.  Pursuant to 28 U.S.C. § 1446(a), a true and legible copy of the First Amended Class Action Complaint is attached hereto as Exhibit A.

3.    As further set forth below, jurisdiction over this case is proper based on diversity, as complete diversity of citizenship exists between Plaintiff and the only named Defendant, KELEOPS

## II.    THE REQUIREMENTS FOR DIVERSITY JURISDICTION ARE SATISFIED

**A.    There is complete diversity of citizenship between the parties:**

4.    This is an action over which this Court has original jurisdiction under the provisions of 28 U.S.C. § 1332, and it is, therefore, one that KELEOPS may remove to this Court pursuant to 28 U.S.C. §§ 1441 and 1446.  Removal under § 1441 is appropriate when complete diversity of citizenship exists between plaintiffs and all properly joined defendants, no properly joined defendant is the citizen of California, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.    Pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, removal is proper in this action because

DEFENDANT KELEOPS USA, INC.'S NOTICE OF REMOVAL OF CIVIL ACTION

there is complete diversity of citizenship between Plaintiff and the only named Defendant, KELEOPS.

6.    KELEOPS is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. (First Amended Complaint, ¶8.) KELEOPS is, therefore, a citizen of the States of Delaware and New York. 28 U.S.C. § 1332(c)(1). Plaintiff resides in Fairfax, California, and is a citizen of the State of California. (First Amended Complaint, ¶7.)

7.    In class actions, only the citizenship of the named parties (the representative plaintiff and named defendants) is considered for diversity purposes; the fact that the action is maintained on behalf of other, nondiverse class members does not affect diversity jurisdiction. *Snyder v. Harris* (1969) 394 U.S. 332, 339-340.

8.    Accordingly, there is complete diversity of citizenship between the parties in this case.

9.    Pursuant to 28 U.S.C. § 1441(b), this action is removable because no party in interest properly joined and served as a defendant is a citizen of California. See 28 U.S.C. § 1441(b) [Providing that non-federal question cases "shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which the action is brought"].

**B.    The amount-in-controversy exceeds the sum or value of $75,000:**

10.    The amount-in-controversy for diversity removal is satisfied in this action. Although the exact amount of damages being sought by Plaintiff is not alleged, it is facially apparent from the First Amended Complaint that the amount-in-controversy between Plaintiff and KELEOPS exceeds the sum or value of $75,000, exclusive of interest and costs. *Singer v. State Farm Mut. Automobile Ins. Co.*, 116 F.3d 373, 376 (9th Cir. 1997). While the court cannot just add up the damages sought by each member of the class, if least one named plaintiff satisfies the jurisdictional minimum, the other unnamed class members can, by virtue of the supplemental jurisdiction conferred on the federal district courts by 28 U.S.C. § 1367, piggyback on that plaintiff's claim. *Snyder v. Harris*, 394 U.S. 332, 336 (1969). Here, Plaintiff's First Amended Complaint seeks statutory damages of $5,000 for *each* violation of California Penal Code § 638.50(b), and also seeks an order of restitution and all other forms of equitable monetary relief. (First Amended Complaint, pg. 43.) Arguably, each time Plaintiff visited the Website the use of the Trackers could constitute a separate violation of § 638.50(b), and Plaintiff could arguably seek

DEFENDANT KELEOPS USA, INC.'S NOTICE OF REMOVAL OF CIVIL ACTION

1  statutory money damages, restitution and equitable monetary relief for each such act. (First Amended
2  Complaint, ¶24.)

3        11.   Based upon the allegations in Plaintiff's First Amended Complaint, the potential number
4  of alleged violations of the CIPA, and the nature of damages being sought by Plaintiff, KELEOPS
5  reasonably asserts that the amount-in-controversy in this action exceeds the sum or value of $75,000,
6  exclusive of interest and costs.

7  **III.   THE PROCEDURAL REQUIREMENTS OF REMOVAL ARE SATISFIED**

8        12.   This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b).  KELEOPS's
9  was served with Plaintiff's First Amended Complaint on January 31, 2025, which is less than 30 days
10  prior to the date of this Notice.

11        13.   The Northern District of California is the federal judicial district encompassing the
12  Superior Court of the State of California, County of Marin, where this suit was originally filed.  Venue
13  is therefore proper in this district under 28 U.S.C. § 1441(a).

14        14.   Jurisdiction pursuant to 28 U.S.C. § 1332 requires consent of all Defendants.  KELEOPS
15  is the only named Defendant in this action and is the party moving for removal.

16        15.   KELEOPS is providing Plaintiff with written notice of the filing of this Notice of
17  Removal as required by 28 U.S.C. § 1446(d).

18        16.   Pursuant to 28 U.S.C. § 1446(d), KELEOPS is filing a copy of this Notice of Removal
19  with the Clerk of the Superior Court of the State of California, County of Marin.  A true and correct copy
20  of the Notice of Filing is attached hereto as Exhibit "B."

21        17.   KELEOPS hereby demands a trial by jury on all issues and all counts of the Complaint.

22        Wherefore, KELEOPS hereby gives notice that the above-entitled state court action, formerly
23  pending in the Superior Court of the State of California, County of Marin, shall be removed to the United
24  States District Court for the Northern District of California.

25        Pursuant to Rule 11 of the Federal Rules of Civil Procedure, I declare that I have read the
26  foregoing; that to the best of my knowledge, based on a reasonable investigation, it is well grounded in
27  fact and is warranted by law; and that it is not interposed for any improper purpose, such as to harass or
28  to cause unnecessary delay or needless increase in the cost of litigation.

- 4 -
DEFENDANT KELEOPS USA, INC.'S NOTICE OF REMOVAL OF CIVIL ACTION

Dated: February 28, 2025                    MURPHY, PEARSON, BRADLEY & FEENEY


                                By _____/s/ John P. Girarde_____
                                    John P. Girarde
                                    Attorneys for Defendant
                                    KELEOPS USA, INC.

JPG.5083457.docx

DEFENDANT KELEOPS USA, INC.'S NOTICE OF REMOVAL OF CIVIL ACTION

# EXHIBIT A

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
          ehorne@bursor.com

*Attorneys for Plaintiff*

**ELECTRONICALLY FILED**
Superior Court of California
County of Marin
**01/28/2025**
James M. Kim, Clerk of the Court
By: N. Johnson, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF MARIN

| | |
|---|---|
| JEFFREY GARON, individually and on behalf of all other persons similarly situated,<br><br>                              Plaintiff,<br><br>        v.<br><br>KELEOPS USA INC.,<br><br>                              Defendant. | Case No. CV0004416<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

**TABLE OF CONTENTS**

PAGE

NATURE OF THE ACTION ............................................................................4

THE PARTIES ................................................................................................5

JURISDICTION AND VENUE .......................................................................5

FACTUAL ALLEGATIONS ...........................................................................6

I.      THE CALIFORNIA INVASION OF PRIVACY ACT ...........................6

I.      DEFENDANT VIOLATES THE CALIFORNIA INVASION OF PRIVACY ACT ...................................................................................9

        A.      Defendant Installed The Trackers On Plaintiff's And Class Members' Browsers ..............................................................9

        B.      The Mechanics And Privacy Implications Of IP Addresses .......................11

                1.      Differentiating Between A Public Versus Private IP Address ........................................................................11

                2.      Privacy Implications Of Public IP Addresses .................14

        C.      Data Brokers And Real-Time Bidding: The Information Economy ........................................................................16

                1.      Data Brokers ........................................................16

                2.      Real-Time Bidding ..............................................21

        D.      The Trackers Are "Pen Registers" ...................................24

                1.      Steamrail Tracker .................................................25

                2.      AGKN Tracker .....................................................28

                3.      Crowd Control Tracker .........................................30

II.     DEFENDANT'S CONDUCT CONSTITUTES AN INVASION OF PLAINTIFF'S AND CLASS MEMBERS' PRIVACY ...........................34

        A.      Defendant Uses The Streamrail Tracker For The Purposes Of Marketing And Advertising .............................................34

        B.      Defendant Uses The AGKN Tracker For The Purposes Of Marketing And Advertising .............................................35

        C.      Defendant Uses The Crowd Control Tracker For The Purposes Of Marketing, Advertising, And Analytics ...........................37

III.    PLAINTIFF'S EXPERIENCE ..........................................................38

CLASS ALLEGATIONS ....................................................................................................40

CAUSES OF ACTION ......................................................................................................42

PRAYER FOR RELIEF .....................................................................................................43

JURY DEMAND ..............................................................................................................43

1    Plaintiff Jeffrey Garon ("Plaintiff"), individually and on behalf of all others similarly situated,

2    by and through his attorneys, makes the following allegations pursuant to the investigation of his

3    counsel and based upon information and belief, except as to allegations specifically pertaining to

4    himself and his counsel, which are based on personal knowledge.

5    **NATURE OF THE ACTION**

6    1.    Defendant Keleops USA Inc., ("Defendant") owns and operates a website,

7    https://gizmodo.com (the "Website").

8    2.    When users visit the Website, Defendant causes four Trackers—the Steamrail

9    Tracker, AGKN Tracker, and Crowd Control Tracker (collectively, the "Trackers")—to be installed

10   on Website visitors' internet browsers.  As a result of this installation, the third parties operating

11   these Trackers—ironSource, Neustar, and Lotame respectively (the "Third Parties")— collect

12   Website visitors' IP addresses and various device identifiers, such as browser and device type (the

13   "Device Fingerprints").   Defendant and the Third Parties then uses these Trackers to identify

14   otherwise anonymous Website visitors and bolster Defendant's revenue through targeted marketing,

15   advertising, and comprehensive data analytics.

16   3.    Because the Trackers capture Website visitors' "routing, addressing, or signaling

17   information," the Trackers constitute a "pen register" under Section 638.50(b) of the California

18   Invasion of Privacy Act ("CIPA").  (Cal. Penal Code § 638.50(b).)

19   4.    By installing and using the Trackers without Plaintiff's prior consent and without a

20   court order, Defendant violated CIPA § 638.51(a).

21   5.    The allegations here are made more invasive by the entities operating the Trackers

22   and collecting Plaintiff's and Class Members' IP Addresses and Device Fingerprints.  Neustar and

23   Lotame are data brokers that add the IP addresses and Device Fingerprints to comprehensive user

24   profiles and use that information to track Plaintiff and Class Members across the Internet.  Those

25   data profiles are then provided to advertisers for more targeted and tailored advertising based on a

26   broad universe of information.  ironSource facilitates that targeted advertising by using IP addresses

27   and Device Fingerprints to allow advertisers to target specific users or groups of users with specific

28

advertisements based on that information.  All of this enriches Defendant, who is able to monetize its Website as the beneficiary of that advertising revenue.  Indeed, Defendant is able to increase the value of its user base to prospective advertisers by allowing Neustar and Lotame to connect IP addresses and Device Fingerprints to broader profiles of other personal information.

6.      Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of CIPA § 638.51.

**THE PARTIES**

7.      Plaintiff Garon resides in Fairfax, California and has an intent to remain there, and is therefore a citizen of California.  Plaintiff Garon was in California when he visited the Website.

8.      Defendant Keleops USA Inc. is a Delaware corporation with its principal place of business in New York, New York.

**JURISDICTION AND VENUE**

9.      This Court has subject matter jurisdiction over this action pursuant to Article VI, section 10 of the California Constitution and California Code of Civil Procedure § 382.

10.      This Court has personal jurisdiction over Defendant pursuant to California Code of Civil Procedure § 410.10 because Defendant conducts substantial business such that Defendant has significant, continuous, and pervasive contacts with the State of California.

11.      As alleged in more detail below, Defendant causes its users' IP addresses to be disclosed to third parties via the Trackers Defendant installs on users' browsers.  An IP address tells Defendant the location of its users.  Thus, Defendant knows which of its users are communicating with the Website from California, and likewise knows when it is disclosing California users' IP addresses.

12.      Moreover, Defendant uses the Trackers for marketing and advertising—specifically, to market and advertise to its users based on their location (as to determined by their IP address).  So, when a user visits the Website from California, Defendant knows the user is coming from California, and uses the Trackers to serve the user advertisements relevant to their California location.  And,

Defendant derives substantial revenue from these California-targeted advertisements, which also increase California user engagement with the Website. Thus, personal jurisdiction exists because Defendant "is not merely aware of its many [California] users and the resulting ad revenue, but it also uses the information it collects [and causes to be sent to undisclosed third parties] to tailor advertisements and content to increase user engagement." *Rancourt v. Meredith Corp.*, (D. Mass. Feb. 1, 2024) 2024 WL 381344, at \*9; *see also Masry v. Lowe's Cos., Inc.*, (N.D. Cal. June 28, 2024) 2024 WL 3228086, at \*5 [sustaining jurisdiction where "Lowes.com has national viewership and appeals to and profits from a California audience"]; *WebZero, LLC v. ClicVU, Inc.*, (C.D. Cal. Apr. 4, 2008) 2008 WL 1734702, at \*6 [jurisdiction established where "California residents have both bought and utilized services from ClicVU, given that 4.2% of its members list California billing addresses, and ClicVU has asserted that users with such billing addresses accounted for $1200 in sales in 2007"].

13.    Finally, Defendant contracted with two data brokers registered in California (and who thus knowingly collect the information of Californians): Neustar[1] and Lotame.[2]

14.    This Court is the proper venue for this action because the conduct alleged in this Complaint occurred in this County.

## FACTUAL ALLEGATIONS

### I.    THE CALIFORNIA INVASION OF PRIVACY ACT

15.    The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." (Cal. Penal Code § 630.)

---

[1] DATA BROKER REGISTRATION FOR NEUSTAR, INC., https://oag.ca.gov/data-broker/registration/562353.

[2] DATA BROKER REGISTRATION FOR LOTAME SOLUTIONS, INC., https://oag.ca.gov/data-broker/registration/186954.

16.    As the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—*the right to control the nature and extent of the firsthand dissemination of his statements.*

*Ribas v. Clark* (1985) 38 Cal. 3d 355, 360-61 (emphasis added; internal citations omitted).

17.    As relevant here, CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

18.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." (Cal. Penal Code § 638.50(b).)

19.    A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." (Cal. Penal Code § 638.50(b).)

20.    In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

21.    Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of these surveillance devices.

22.    For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address the email was sent to, and the subject line—because this is the user's *outgoing* information.  On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is *incoming* information that is being sent to that same user.

23.    Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." (*In re Google Inc.* (N.D. Cal. Sep. 26, 2013) 2013 WL 5423918, at *21. Thus, courts have repeatedly applied the CIPA—including the provisions at issue here—to the Internet. *See, e.g., Shah v. Fandom, Inc.* (N.D. Cal. Oct. 21, 2024) --- F. Supp. 3d ---, 2024 WL 4539577, at *21 [finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"]; *Mirmalek v. Los Angeles Times Communications LLC* (N.D. Cal. Dec. 12, 2024) 2024 WL 5102709, at *3-4 (same); *Moody v. C2 Educ. Sys. Inc.* (C.D. Cal. July 25, 2024) --- F. Supp. 3d ---, 2024 WL 3561367, at *3 ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley v. Kochava, Inc.* (S.D. Cal. 2023) 684 F. Supp. 3d 1024, 1050 [referencing CIPA's "expansive language" when finding software was a "pen register"]; *Javier v. Assurance IQ, LLC* (9th Cir. May 31, 2022) 2022 WL 1744107, at *1 ["Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."].)  This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." (*Matera v. Google Inc.* (N.D. Cal. Aug. 12, 2016) 2016 WL 8200619, at *19.)

24.    Individuals may bring an action against the violator of any provision of CIPA for $5,000 per violation.  (Cal. Penal Code § 637.2(a)(1).)

## I.  DEFENDANT VIOLATES THE CALIFORNIA INVASION OF PRIVACY ACT

### A.  Defendant Installed The Trackers On Plaintiff's And Class Members' Browsers

25.    Defendant owns and operates the Website, which is "one of the internet's very first tech news blogs, [and] is dedicated to fiercely independent reporting and commentary on technology, science, and internet culture."[3]

26.    When companies like Defendant build their websites, they install or integrate various third-party scripts into the code of the website to collect data from users or perform other functions.[4]

27.    Often times, third-party scripts are installed on websites "for advertising purposes."[5] Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."

28.    To make Defendant's Website load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Website data is stored. In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions.  A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests. (See Figure 1.)

//

//

//

//

//

//

//

---

[3] *About Gizmodo*, GIZMODO, https://gizmodo.com/about (last visited Jan. 27, 2025).

[4] See *Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[5] *Id.*

**Figure 1:**



29.     The server's instructions include how to properly display the Website—*e.g.*, what images to load, what text should appear, or what music should play.

30.     In addition, the server's instructions (*i.e.*, the Website's code, as programmed by Defendant) cause the Trackers to be installed on a user's browser. The Trackers then cause the browser to send identifying information—including the user's IP address—to ironSource, Neustar, and Lotame.

31.     Defendant also causes additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices. In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements (the "device identifier information") form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

32.     Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff and Class Members visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers. Upon being installed on users' browsers, the third parties operating the Trackers—

ironSource, Neustar, and Lotame—collect users' IP address and other device information. Defendant and the third parties then use this information for marketing, advertising, and analytics purposes.

33.     At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members's browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members's consent for such conduct.  Nor did Defendant obtain a court order to install or use the Trackers.

**B.     The Mechanics And Privacy Implications Of IP Addresses**

34.     An IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses.  Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses.  While IPv6 adoption has been increasing, many networks still rely on IPv4.[6]

35.     Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another.  An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.

*1.     Differentiating Between A Public Versus Private IP Address*

36.     A public IP address is accessible from anywhere on the internet; it is assigned by an Internet Service Provider ("ISP") and it is unique globally.  Public IP addresses are required for devices that need direct internet access.

37.     While public IP addresses are unique, they are not necessarily "public" in the sense that they are freely accessible.  If an individual is not actively sending data packets out, the public IP address remains private and is not broadcast to the wider internet.

---

[6]  *See, e.g., What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

38.     Public IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services.

39.     A private IP address is used within an internal network and is not routable on the public internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). Thus, private IP addresses can be used repeatedly across different networks because they are isolated from the global internet. For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

40.     The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication. And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

41.     An analogy is useful. A public IP address is like the number for a landline telephone for a household. A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2"). Nothing can be gleaned from knowing Handset #1 versus Handset #2 is making a call. But a lot can be gleaned from knowing the phone number who is making the call.

42.     The same is true of IP addresses. Nothing can be gleaned from determining whether a user is using their laptop or smartphone to access a website by itself. But the public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large.[7]

---

[7] That being said, as discussed below, the Trackers also collect "device identifier information," which is used alongside the IP address to digitally "fingerprint" individuals. So, by installing the Trackers

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. CV0004416

12

43.    Thus, the differences between public and private IP addresses are as follows:[8]

**Figure 2:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

44.    A public IP address is therefore "routing, addressing, or signaling information."

45.    A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

46.    A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[9]

---

on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the device identifier information).

[8] *What's The Difference Between A Public And Private IP Address?,* AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

[9] Anthony Freda, *Private IP vs Public IP: What's the Difference?,* AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

<u>Figure 3</u>:



Each device on a network has a private IP address, and the router has a public IP address to
communicate with the rest of the internet.

>    2.    *Privacy Implications Of Public IP Addresses*

47.    Through a public IP address, a device's state, city, zip code, and approximate latitude
and longitude can be determined.  Thus, knowing a user's public IP address—and therefore
geographical location—"provide[s] a level of specificity previously unfound in marketing."[10]

48.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities,
neighborhoods, and … postal code"[11] and (ii) "to target specific households, businesses[,] and even
individuals with ads that are relevant to their interests."[12]  Indeed, "IP targeting is one of the most
targeted marketing techniques [companies] can employ to spread the word about [a] product or
service"[13] because "[c]ompanies can use an IP address … to personally identify individuals."[14]

49.    In fact, a public IP address is a common identifier used for "geomarketing," which is

---

[10] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023),
https://www.accudata.com/blog/ip-targeting/.

[11] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/
geotargeting-strategies/.

[12] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29,
2023),        https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-
williams-z7bhf.

[13] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023),
https://www.accudata.com/blog/ip-targeting/.

[14] Trey Titone, *The Future Of Ip Address As An Advertising Identifier*, AD TECH EXPLAINED (May
16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

"the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[15] For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[16]

50. "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[17]

51. "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[18]

52. In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[19] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[20]

53. In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[21] "By analyzing data on which households or businesses are responding to their

---

[15] *See, e.g., The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[16] *See, e.g., Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[17] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj 0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV 5-5maUaAgtNEALw_wcB.

[18] *Id.*

[19] Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.

[20] *Id.*

[21] *Id.*

---

ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[22]

54.     The collection of IP addresses here is particularly invasive here given Neustar's and Lotame's status as data brokers.  As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his ... IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address.  The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[23]

55.     In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, Neustar and Lotame specifically attach IP addresses to comprehensive user profiles, tracking Plaintiff and Class Members across the Internet using their IP addresses and compiling vast reams of other personal information in the process.

56.     For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[24]

### C.     Data Brokers And Real-Time Bidding: The Information Economy

57.     To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand the role of data brokers and real-time bidding.

#### 1.     Data Brokers

58.     While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[25] California law defines a "data broker" as "a business that knowingly collects and sells to third

---

[22] Id.

[23] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[24] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; see also WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.

[25] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND

parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. (Cal. Civ. Code § 1798.99.80(c).)

59.     Any entity that qualifies as a "data broker" under California law must specifically register as such (Cal. Civ. Code § 1798.99.82(a)), which both Neustar[26] and Lotame[27] do.

60.     "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[28]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[29]

61.     For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)."  The former "is data that has been collected and is actual," such as websites visited."  Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do.  On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[30]

62.     Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[31]  The report found that

---

DEMOCRACY, at 2 (2021), https://techpolicy.sanford.duke.edu/wp-content/uploads/sites/4/2021/08/Data-Brokers-and-Sensitive-Data-on-US-Individuals-Sherman-2021.pdf.

[26] DATA BROKER REGISTRATION FOR NEUSTAR, INC., https://oag.ca.gov/data-broker/registration/562353.

[27] DATA BROKER REGISTRATION FOR LOTAME SOLUTIONS, INC., https://oag.ca.gov/data-broker/registration/186954.

[28] SHERMAN, *supra*, at 2.

[29] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[30] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.

[31] SHERMAN, *supra*, at 1.

---

"data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[32]

63.     This data collection has grave implications for Americans' right to privacy.     For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[33]

64.     As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights.  Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. 59 Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

> …

> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[34]

---

[32] *Id.*

[33] *Id.* at 9.

[34] *Id.*

65.     Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[35]

**Figure 4:**



66.     As noted above, data brokers like Neustar and Lotame are able to compile such wide swaths of information in part by collecting users' IP addresses and Device Fingerprint Information,

---

[35] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

which is used by data brokers like Neustar and Lotame to track users across the Internet.[36]  Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[37]

67.    These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[38]

68.    In short, by just collecting IP addresses and Device Fingerprint Information, data brokers like Neustar and Lotame can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

69.    As a result of Defendant's installation the trackers of data brokers like Neustar and Lotame on the browsers of users of Defendant's Website, the information of Plaintiff and Class Members is linked to any profiles these data brokers may have about them using their IP addresses and Device Fingerprint Information (or new profiles are created for Plaintiff and Class Members). These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP addresses and Device Fingerprint Information linked to these data broker profiles.  Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses and Device Fingerprint Information without consent.

---

[36] *Id.* at 11.

[37] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[38] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

### 2. Real-Time Bidding

70.     So, once data brokers collect Website users' IP addresses and Device Fingerprint Information and create or link that information to comprehensive user profiles, how do data brokers "sell" or otherwise help Defendant monetize that information?  This is where real-time bidding—and the Adrta and Steam Trackers—comes in.

71.     "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[39]

72.     "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)."  An SSP—which is what the Steamrail Tracker is[40]—"work[s] with website or app publishers to help them participate in the RTB process."  "DSPs primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[41]  And an Advertising Exchange "is a real-time online marketplace where advertisers and publishers can buy and sell advertising space and impressions."[42]

73.     In other words, SSPs like ironSource provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

74.     The RTB process works as follows:

> After a user loads a website or app, an SSP [here, ironSource] will send user data to Advertising Exchanges ... The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more.  After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs.  The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

---

[39] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[40] AD EXCHANGE, https://www.is.com/glossary/ad-exchange/ ("[P]ublishers, such as ironSource often act as SSPs.").

[41] Geoghegan, *supra*.

[42] AD EXCHANGE, https://www.is.com/glossary/ad-exchange/.

---

Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[43]

**Figure 5:**



75.     Facilitating this real-time bidding process means an SSP like ironSource must collect and know information about Defendant's users, such as their IP address and Device Fingerprint Information.   But ironSource receives assistance because Defendant also installs Neustar's and Lotame's Trackers on its users' browsers.

the economic incentives of an auction mean that DSP with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities.  As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP). DSPs send bid requests to DMPs, who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers.[44]

---

[43] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

[44] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, https://tinyurl.com/yjddt5ey.

76.     In other words, before bidding to show a user an advertisement, a DSP will attempt to determine what other information about a user may be available.  A DSP does this by connecting with an entity like Neustar or Lotame, whose Trackers match the IP address and Device Fingerprint Information they collect from Website users with any profiles on those users Neustar or Lotame may have compiled.   If there is a match, then advertisers will pay more money to show users an advertisement because the advertisers have more information to base their targeting on.   This naturally enriches Defendant, as its users have now become more valuable.

77.     As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

- "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

- "send[ing] sensitive data across geographic borders."

- sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad.  Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[45]

78.     Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[46]  This is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against.  ((*Ribas*, *supra*, 38 Cal. 3d at 361 [noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"]); *U.S. Dep't of Justice v. Reporters Comm. for*

---

[45] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[46] Geoghegan, *supra*.

*Freedom of the Press* (1989) 489 U.S. 749, 763-64 ["[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or his person."].)

*    *    *

79.    To summarize the proceeding allegations, Defendant monetizes its Website by installing the Steamrail Tracker on users' browsers, and therefore enabling ironSource to collect Website users' IP addresses and Device Fingerprint Information. ironSource then auctions off those users (and Defendant's advertising space) in real-time bidding.

80.    The value of those users is enriched because Defendant also installs the AGKN and Crowd Control Trackers, which enable Neustar and Lotame to collect Website users' IP addresses and Device Fingerprint Information. Neustar and Lotame then match that information to profiles Neustar and Lotame maintain on those users and supply advertisers with that information in a "bid request." This causes advertisers to bid more money to show an advertisement to Defendant's users.

81.    Thus, Defendant is unjustly enriched through its installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and which enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and advertisers themselves without knowledge or consent. And, because Defendant installs the GKN and Crowd Control Trackers on Plaintiff's and Class Members' browsers, Neustar and Lotame continue to track Plaintiff and Class Members wherever they go online, this building even more comprehensive user profiles over time that are provider to Neustar's and Lotame's other clients.

**D.    The Trackers Are "Pen Registers"**

82.    As alleged below, Defendant installs each of the Trackers on users' browser for marketing and analytics purposes. Through the Trackers, the Third Parties collect information—users' IP addresses—that identifies the outgoing "routing, addressing, or signaling information" of the user. Through the Trackers, the Third Parties also collect users' Device Fingerprint Information,

including browser type and device type, that allows for further identification of users.  Accordingly, the Trackers are each "pen registers."

83.     Defendant installs a variety of Trackers on the Website (*e.g.*, Steamrail, AGKN, and Crowd Control).  However, all of these Trackers operate in the same manner in that they collect the same information (*i.e.*, Plaintiffs' and Class Members' IP addresses and Device Fingerprint Information).  Thus, any given time a user visits the Website, Defendant will cause at least one of the Trackers to be installed on users' browsers, and that Tracker (or those Trackers) will collect the user's IP addresses and Device Fingerprint Information.

### 1.     *Steamrail Tracker*

84.     IronSource is a software-as-a-service company that develops the Steamrail Tracker, which it provides to website owners like Defendant for a fee.

85.     As noted above, ironSource is a Supply Side Platform that "powers the app economy, helping mobile content creators prosper with a leading business platform designed to turn any app into a business."[47]   IronSource is also "[t]he first platform to provide instant access to in-app bidding."[48]

86.     In other words, ironSource enables companies to sell advertising space on their apps, thereby earning revenue, and allows companies to place advertisements on other companies' apps, thereby driving brand awareness and sales.  To achieve this, ironSource uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

87.     The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the Steamrail Tracker on the user's browser.  The Steamrail Tracker, in turn, instructs the user's browser to send ironSource the user's IP address.

---

[47] *Get to Know Us*, IRONSOURCE, https://www.is.com/about/.

[48] *Empowering Every Developer to Maximize Revenue With In-App Bidding*, IRONSOURCE https://www.is.com/in-app-bidding/.

88.     Moreover, ironSource stores a cookie with the user's IP address in the user's browser cache.  When the user subsequently visits Defendant's Website, the Steamrail Tracker locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the Steamrail Tracker causes the browser to send the cookie along with the user's IP address to ironSource.  A general diagram of this process is pictured below as Figure 6, which explains how the Website causes the Steamrail Tracker to install a cookie on the user's browser instructs the user's browser to send the user's IP address through the cookie.  (See Figure 6.)

**Figure 6:**



89.     If the user clears his or her cookies, then the user wipes out the Steamrail Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website the process begins over again: (i) Defendant's server installs the Steamrail Tracker on the user's browser, (ii) the Steamrail Tracker instructs the browser to send ironSource the user's IP address, (iii) the Steamrail Tracker stores a cookie in the browser cache, and (iv) ironSource will continue to receive the user's IP address on subsequent Website visits as part of the cookie transmission.  (See Figure 7.)

//
//
//
//
//
//
//

**Figure 7:**

90.     The screenshot above also indicates that the IP address was copied into the Steamrail Tracker, meaning Defendant affirmatively chose for ironSource to collect the IP address through the Steamrail Tracker.

91.     The Steamrail Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." (*Greenley, supra,* 684 F. Supp. 3d at 1050.)

92.     Further, the Steamrail Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." (See, e.g., *James v. Walt Disney Co.* (N.D. Cal. Nov. 8, 2023) 701 F. Supp. 3d 942, 958.)

93.     Because the Steamrail Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

### 2.     AGKN Tracker

94.     Neustar is a software-as-a-service company that develops the AGKN Tracker, which it provides to website owners like Defendant for a fee.

95.     As noted above, Neustar is a register data broker in California that claims to "[t]ransform omnichannel media performance with the next generation of identity-driven marketing capabilities."[49]

96.     In other words, Neustar compiles comprehensive user profiles by tracking users across the Internet. Neustar then enriches the information of its client's end users (like Defendant's end users) with the profile data to make that information more valuable to advertisers, thereby driving Defendant's revenue. To achieve this, Neustar uses its AGKN Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

97.     Similar to above, the first time a user visits Defendant's Wired Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the AGKN Tracker on the user's browser. The AGKN Tracker, in turn, instructs the user's browser to send Neustar the user's IP address.

98.     Moreover, Neustar stores a cookie with the user's IP address in the user's browser cache. When the user subsequently visits Defendant's Wired Website, the AGKN Tracker locates the cookie identifier stored on the user's browser. If the cookie is stored on the browser, the AGKN Tracker causes the browser to send the cookie along with the user's IP address to Neustar. (See Figure 6, *supra*.)

---

[49] *TruAudience*, TRANSUNION, https://www.transunion.com/solution/truaudience.

99.     If the user clears his or her cookies, then the user wipes out the AGKN Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website the process begins over again: (i) Defendant's server installs the AGKN Tracker on the user's browser, (ii) the AGKN Tracker instructs the browser to send Neustar the user's IP address, (iii) the AGKN Tracker stores a cookie in the browser cache, and (iv) Neustar will continue to receive the user's IP address on subsequent Website visits as part of the cookie transmission.  (See Figure 8.)

**Figure 8:**



100.    The screenshot above also indicates that the IP address was copied into the AGKN Tracker, meaning Defendant affirmatively chose for Neustar to collect the IP address through the AGKN Tracker.

101.    The AGKN Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." (*Greenley, supra,* 684 F. Supp. 3d at 1050.)

102.    Further, the AGKN Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." (*James, supra,* 701 F. Supp. 3d at 958.)

103.    Because the AGKN Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

### 3.    *Crowd Control Tracker*

104.    Lotame is a software-as-a-service company that develops the Crowd Control Tracker, which it provides to website owners like Defendant for a fee.

105.    As noted above, Lotame is a registered data broker in California that claims to be an "All-in-One Solution for Digital Marketers, Agencies & Media Owners."[50] "Lotame is a technology company that makes data smarter, faster, and easier to use for digital marketers."[51]

106.    Lotame's "end-to-end data collaboration platform Spherical empowers thousands of marketers, agencies, and media owners to onboard, access, analyze, and activate the data they need to understand and engage consumers."[52]

107.    Specifically, "digital marketers can combine data internally and partner externally for actionable customer intelligence, data informed audiences, and identity powered activation."[53] Lotame's clients can "[o]nboard first-party data to river even greater value" from users' data."[54] And, more notably, Lotame enables clients to "[a]ccess the premier global data marketplace" through "off-the-shelf or custom audiences from Lotame and leading branded providers," which provide "a

---

[50] LOTAME, https://www.lotame.com/.

[51] *Meet Lotame,* LOTAME, https://www.lotame.com/about-lotame/.

[52] *Id.*

[53] *Id.*

[54] *Id.*

raw data firehose or provisioned to [the client's] channel of choice."[55] Lotame helps companies "sell [] high-quality addressable audiences to digital marketers and agencies around the work" to "[i]ncrease revenue opportunities … [from] valuable first-party data."[56] All of which is done through the Crowd Control Tracker.

108.    In other words, Lotame compiles comprehensive user profiles by tracking users across the Internet.  Lotame then enriches the information of its client's end users (like Defendant's end users) with the profile data to make that information more valuable to advertisers, thereby driving Defendant's revenue.  To achieve this, Lotame uses its Crowd Control Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

109.    Similar to above, the first time a user visits Defendant's Website while the Crowd Control Tracker is present, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the Crowd Control Tracker on the user's browser.  The Crowd Control Tracker, in turn, instructs the user's browser to send Lotame the user's IP address, as the below testing from Plaintiff's browser indicates.  (See Figure 9.)[57]

//
//
//
//
//
//
//
//
//
//

[55] Id.

[56] LOTAME, https://www.lotame.com/solutions-data-marketplace-sellers/.

[57] Plaintiff's IP address has been mostly redacted to protect his privacy.

**Figure 9:**

110.    Moreover, Lotame stores a cookie with the user's IP address in the user's browser cache.  When the user subsequently visits Defendant's Website, the Crowd Control Tracker locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the Crowd Control Tracker causes the browser to send the cookie along with the user's IP address to Lotame. (See Figure 10.)

//

//

//

//

//

//

//

**Figure 10:**



111.    If the user clears his or her cookies, then the user wipes out the Crowd Control Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website the process begins over again: (i) Defendant's server installs the Crowd Control Tracker on the user's browser, (ii) the Crowd Control Tracker instructs the browser to send Lotame the user's IP address, (iii) the Crowd Control Tracker stores a cookie in the browser cache, and (iv) Lotame will continue to receive the user's IP address on subsequent Website visits as part of the cookie transmission.

112.    The Crowd Control Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." (*Greenley, supra*, 684 F. Supp. 3d at 1050.)

113.    Further, the Crowd Control Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." (*James, supra*, 701 F. Supp. 3d at 958.)

114.    Because the Crowd Control Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA section 638.50(b).

## II.    DEFENDANT'S CONDUCT CONSTITUTES AN INVASION OF PLAINTIFF'S AND CLASS MEMBERS' PRIVACY

115.    As alleged herein, the Trackers are designed to conduct targeted advertising, build comprehensive profiles of Website users and track Website users across the Internet, and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' data.

116.    Thus, the collection of Plaintiff's and Class Members' personally identifying information by the Third Parties through Defendant's installation and use of the Trackers constitutes an invasion of privacy, as well as an unjust enrichment by Defendant off of Plaintiff's and Class Members' non-consensually collected information.

### A.    Defendant Uses The Streamrail Tracker For The Purposes Of Marketing And Advertising

117.    As noted above, ironSource is a Supply Side advertising platform that helps companies like Defendant market and advertise user data from its Website.

118.    "ironSource powers the app economy, helping mobile content creators prosper with a leading business platform designed to turn any app into a business."[58] Specifically, "ironSource enables app developers to monetize their apps through mobile app advertising in the form of banner ads, interstitial ads, rewarded video ads, and offerwalls."[59]

---

[58] *Get To Know Us*, IRONSOURCE, https://www.is.com/about/.

[59] *Ad Units*, IRONSOURCE, https://developers.is.com/ironsource-mobile/general/ad-units-2.

119. "Ads are served from top network advertisers, and partners are paid each time their users interact with any of the ads in their app."[60]  Notably, ironSource helps "[t]ailor [companies'] ad strategy to user groups by country, app version, ADFA, device, model, game level, paying users – or even custom segments."[61]

120. To perform the functions listed above, ironSource needs to collect data that identifies a particular user.  This is why ironSource collects IP addresses: it allows ironSource to ascertain a user's location and target that user with advertisements tailored to their location, as well as to track a user's Website activity over time (*i.e.*, through repeated Website visits).

121. ironSource also integrates with the other Trackers on the Website to enrich Defendant's user data and therefore obtain higher bids to show advertisements to Defendant's users.

122. In other words, when users visit Defendant's Website, ironSource collects users' IP addresses through its Steamrail Tracker so that Defendant can sell Defendant's user inventory to advertisers interested in serving targeted advertisements on Defendant's users.  All of this helps Defendant further monetize its Website and maximize revenue by collecting and disclosing user information.

**B.    Defendant Uses The AGKN Tracker For The Purposes Of Marketing And Advertising**

123. As noted above, Neustar is a registered data broker in California that helps companies like Defendant enrich user data and obtain the most value from targeted advertisements.  On the side, Neustar also compiles comprehensive user profiles by tracking users across the Internet and providing those profiles to other clients for their targeted advertising efforts (or further enriching Defendant through the data obtained on other websites).

124. According to Neustar, it "powers data-driven marketing and measurement with a suite of privacy-first identity resolution, data enrichment, audience targeting and advanced analytics solutions."[62]

---

[60] *In-App Bidding*, IRONSOURCE, https://www.is.com/in-app-bidding/.

[61] *Segments*, IRONSOURCE, https://www.is.com/segments/.

[62] *TruAudience*, TRANSUNION, https://www.transunion.com/solution/truaudience

125. Similar to above, Neustar enables advertisers to more directly target specific people. This is done through their TruAudience Identity Solutions, which "[t]ransform omnichannel marketing and media performance with the next generation of identity resolution capabilities."[63] This service helps "[r]educe media waste and off-target advertising by deduplicating identities and removing incorrect information."[64]

126. Neustar boasts that this "real-time identity management" helps websites, like Defendant, have "10x [r]eturn on your investment in your solution."[65]

127. Neustar collects data to use for targeted marketing. For example, Neustar "[c]onnects known and unknown consumer data – across devices, households and channels."[66] Specifically, "Neustar's Customer Identity File gives you access to the most accurate and complete name, address, phone and email data available. The data is compiled, verified, and enhanced with hundreds of demographic, behavioral, financial, property, segmentation and geographic attributes."[67]

128. Further, as alleged above, the user profiles Neustar compiles are not just used by Defendant. Instead, Neustar maintains those profiles and discloses those profiles to other clients to assist with their targeted advertising efforts. Defendant still benefits, however, and the more data Neustar collects from other websites, the more information will be known about Defendant's users and the more valuable those users will be to advertisers.

129. To perform the functions listed above, Neustar needs to collect data that identifies a particular user. This is why Neustar collects IP addresses: it allows Neustar to link one of Defendant's Website users to any profile Neustar may have about that user, and Neustar can in turn provide that profile to interested advertisers for more targeted advertising. The IP address also allows

---

[63] *TruAudience Identity Solutions*, TRANSUNION, https://www.transunion.com/solution/truaudience/identity.

[64] *Id.*

[65] *Id.*

[66] *TruAudience Identity Solutions*, TRANSUNION, https://www.transunion.com/solution/truaudience/data-collaboration.

[67] NEUSTAR CUSTOMER IDENTITY FILE, https://aws.amazon.com/marketplace/pp/prodview-cvacsmxxz4txs#overview.

Neustar to track a user's Website activity over time (*i.e.*, through repeated Website visits) and to track that user on other websites.

130.    In other words, when users visit Defendant's Website, Neustar collects users' IP addresses through its AGKN Tracker to build comprehensive user profiles, which are used to identify Defendant's users, enrich Defendant's user data, and make those users more valuable to prospective advertisers by allowing advertisers to better target specific users. All of this helps Defendant further monetize its Website and maximize revenue by collecting and disclosing user information.

**C.    Defendant Uses The Crowd Control Tracker For The Purposes Of Marketing, Advertising, And Analytics**

131.    As noted above, Lotame is a registered data broker in California that claims to help companies like Defendant "[m]onetize all your inventory across browsers, devices, and platforms, including social and CTV. Powered by Panorama Identity, Lotame's data solutions provide data sellers with the right tech and collaboration tools to capture more digital marketer and agency dollars in direct and programmatic channels."[68]

132.    Lotame enables markers and agencies to "[e]xtend audiences to adtech platforms for personalization, acquisition, and retention."[69] These customized ads are created using data from Lotame's data marketplace, which allows users to "[b]uild and activate custom audiences from direct, premium publishers and trusted third-party data suppliers within the Spherical platform via a raw data firehose or provisioned to your channel of choice."[70]

133.    Lotame does this through its Panorama ID, which "connects and unifies consumer digital touch points across emails, cookies, and device IDs to offer a single view of a user," yielding "a mix of deterministic and probabilistic links."[71]

---

[68] *Data Marketplace Sellers*, LOTAME, https://www.lotame.com/solutions-data-marketplace-sellers/.

[69] *Marketers & Agencies*, LOTAME, https://www.lotame.com/marketers-agencies/.

[70] *Id.*

[71] PANORAMA IDENTITY, https://www.lotame.com/panorama-identity/.

134.    Lotame touts that the Panorama Graph not only "unlocks addressability to 1.3 billion users with global coverage," it is a way for website operators like Defendant to sidestep "privacy regulations" and more directly target users.[72]

135.    To perform the functions listed above, Lotame needs to collect data that identifies a particular user.   This is why Lotame collects IP addresses: it allows Lotame to link one of Defendant's Website users to any profile Lotame may have about that user, and Lotame can in turn provide that profile to interested advertisers for more targeted advertising.   The IP address also allows Lotame to track a user's Website activity over time (*i.e.*, through repeated Website visits) and to track that user on other websites.

136.    In other words, when users visit Defendant's Website, Lotame collects users' IP addresses through its Crowd Control Tracker to build comprehensive user profiles, which are used to identify Defendant's users, enrich Defendant's user data, and make those users more valuable to prospective advertisers by allowing advertisers to better target specific users.   All of this helps Defendant further monetize its Website and maximize revenue by collecting and disclosing user information.

## III.    PLAINTIFF'S EXPERIENCE

137.    Plaintiff has regularly visited the Websites on his desktop browser—as long ago as 2010 and as recently as March 2024—and has done so throughout the entirety of the class period.

138.    When Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the Crowd Control Tracker to be installed on Plaintiff's browser. Through the Crowd Control Tracker, Lotame collected Plaintiff's IP address and Device Fingerprint Information (his browser, operating system, and device type).[73]  (See Figure

---

[72] PANORAMA GRAPH, https://www.lotame.com/panorama-identity-graph/.
[73] Again, Plaintiff's IP address has been mostly redacted to protect his privacy.

**Figure 11:**



139.     Defendant and Lotame used the information collected by the Crowd Control Tracker to enrich user data, serve targeted advertisements based on Plaintiff's location and other attributes Lotame knew about Plaintiff, build a comprehensive user profile and track Plaintiff across the Internet (in Lotame's case), and ultimately boost Defendant's and advertisers' revenue.

140.     Although Defendant utilizes at least three different Trackers on the Website (Steamrail, AGKN, and Crowd Control), they all operate in the same manner and perform the same function, *i.e.*, collecting Plaintiff's and Class members' IP addresses and device information.  Thus, at any given time a user visits the Website, Defendant will cause one of the Trackers to be installed on users' browsers for the purpose of collecting IP addresses and device information.  Accordingly, the installation and use of the Crowd Control Tracker on Plaintiff's browser is substantially similar to the installation and use of the Steamrail and AGKN Trackers on Class Members' browsers.

141.    Plaintiff did not provide his prior consent to Defendant to install or use the Crowd Control Tracker on Plaintiff's browser.  Nor did Defendant obtain a court order before installing or using the Crowd Control Tracker.

142.    Plaintiff has, therefore, been injured by Defendant's violations of CIPA § 638.51(a).

## CLASS ALLEGATIONS

143.    Pursuant to Cal. Code Civ. Proc. § 382, Plaintiff seeks to represent a class defined as all California residents who accessed the Website while in California and had their IP address collected by the Trackers (the "Class").

144.    The following people are excluded from the Class: (i) any Judge presiding over this action and members of her or her family; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

145.    **Numerosity:** The number of people within the Class is substantial and believed to amount to thousands, if not millions of persons.  It is, therefore, impractical to join each member of the Class as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.  Moreover, the Class is ascertainable and identifiable from Defendant's records.

146.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary

between members of the Class, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

    (a)    Whether Defendant violated CIPA § 638.51(a);

    (b)    Whether the Trackers are "pen registers" pursuant to Cal. Penal Code § 638.50(b);

    (c)    Whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;

    (d)    Whether Defendant sought or obtained a court order for its use of the Trackers; and

    (e)    Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

147.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other members of the Class Members, visited the Website and had his IP address collected by the Trackers, which were installed and used by Defendant.

148.    **Adequate Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

149.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class. Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class

1   treatment of the liability issues will ensure that all claims and claimants are before this Court for

2   consistent adjudication of the liability issues.

3   ## CAUSES OF ACTION

4   ### COUNT I
    ### Violation Of The California Invasion Of Privacy Act,
5   ### Cal. Penal Code § 638.51(a)

6   150.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set

7   forth herein.

8   151.    Plaintiff brings this claim individually and on behalf of the members of the proposed

9   Class against Defendant.

10  152.    CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register

11  or a trap and trace device without first obtaining a court order."

12  153.    A "pen register" is a "a device or process that records or decodes dialing, routing,

13  addressing, or signaling information transmitted by an instrument or facility from which a wire or

14  electronic communication is transmitted, but not the contents of a communication." (Cal. Penal Code

15  § 638.50(b).)

16  154.    The Trackers are "pen registers" because they are "device[s] or process[es]" that

17  "capture[d]" the "routing, addressing, or signaling information"—the IP address—from the

18  electronic communications transmitted by Plaintiff's and the Class's computers or smartphones.

19  (Cal. Penal Code § 638.50(b).)

20  155.    At all relevant times, Defendant installed the Trackers—which are pen registers—on

21  Plaintiff's and Class Members' browsers, which enabled the Third Parties to collect Plaintiff's and

22  Class Members' IP addresses.  Defendant then used the Trackers in conjunction with the Third

23  Parties to conduct more extensive and invasive targeted advertising and monetize its Website, thus

24  unjustly enriching itself via its disclosure of Plaintiff's and Class Members' IP addresses without

25  prior consent.

26  156.    The Trackers do not collect the content of Plaintiff's and the Class's electronic

27  communications with the Website. (*In re Zynga Privacy Litig.* (9th Cir. 2014) 750 F.3d 1098, 1108

28

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. CV0004416                                                                    42

["IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…"] [cleaned up].)

157.    Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers.

158.    Defendant did not obtain a court order to install or use the Trackers.

159.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Class, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)    For statutory damages of $5,000 for each violation of CIPA § 638.51(a);

(e)    For pre- and post-judgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief; and

(g)    For an order awarding Plaintiff and the Class their reasonable attorney's fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

1   Dated: January 28, 2025

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: _____
            Emily A. Horne

L. Timothy Fisher (State Bar No. 191626)
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
           ehorne@bursor.com

*Attorneys for Plaintiff*

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Bursor & Fisher, P.A., 1990 North California Blvd, 9th Floor, Walnut Creek, California 94596. On January 28, 2025, I served the document(s):

**FIRST AMENDED CLASS ACTION COMPLAINT**

☒  by causing a personal delivery of a copy of the document(s) listed above to the person(s) at the address(es) set forth below.

Keleops USA Inc.
c/o Registered Agent Solutions, Inc.
838 Walker Road, Suite 21-2
Dover, DE 19904

*Registered Agent for Defendant Keleops USA Inc.*

I declare under penalty of perjury under the laws of the State of California that the above is true and correct, executed on January 28, 2025, at Walnut Creek, California.

Judy Fontanilla

EXHIBIT B

1  Thomas F. Mazzucco - 306681
       TFMazzucco@mpbf.com
2  Christopher R. Ulrich - 271288
       CUlrich@mpbf.com
3  John P. Girarde - 191518
       JGirarde@mpbf.copm
4  MURPHY, PEARSON, BRADLEY & FEENEY
   580 California Street, Suite 1100
5  San Francisco, CA  94104-1001
   Telephone:    (415) 788-1900
6  Facsimile:    (415) 393-8087

7  David van Leeuwen, Esq.
   Peyrot & Associates, PC.
8  62 William Street, 8th Floor,
   New York, NY 10005
9  Telephone:    (646) 650-2785
   Facsimile:    (646) 650-5109
10     David.vanleeuwen@peyrotlaw.com
   (*Pro Hac Vice Forthcoming*)
11
   Attorneys for Defendant
12 KELEOPS USA, INC.

13

14              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15                          **COUNTY OF MARIN**

16

17 JEFFREY GARON, individually and on behalf     Case No.: CV0004416
   of all persons similarly situated,
18                                              **NOTICE TO MARIN COUNTY SUPERIOR**
                        Plaintiff,             **COURT OF DEFENDANT KELEOPS USA,**
19                                              **INC.'S FILING OF NOTICE OF**
                v.                              **REMOVAL OF CIVIL ACTION TO THE**
20                                              **UNITED STATES DISTRICT COURT,**
   KELEOPS USA, INC.,                          **NORTHERN DISTRICT OF CALIFORNIA**
21
                        Defendant.
22

23 TO THE CLERK OF THE ABOVE-CAPTIONED COURT:

24         NOTICE IS HEREBY GIVEN that on February 28, 2025, Defendant KELEOPS USA, INC.

25 filed a Notice of Removal pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, removing the above-entitled

26 civil action from the Superior Court of the State of California, County of Marin to the United States

27 District Court for the Northern District of California, based upon diversity of citizenship.  A true and

28 correct copy of the Notice of Removal is attached hereto as Exhibit 1.

                                          - 1 -

1    DATED:  February 28, 2025

2

3

4

5    JPG.5083714.docx

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MURPHY, PEARSON, BRADLEY & FEENEY

By _____
    Thomas F. Mazzucco
    Attorneys for Defendant
    KELEOPS USA, INC.

NOTICE TO MARIN COUNTY SUPERIOR COURT OF DEFENDANT'S FILING OF NOTICE OF REMOVAL OF
CIVIL ACTION TO THE UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA

EXHIBIT 1

1 | Thomas F. Mazzucco - 306681
      TFMazzucco@mpbf.com
2 | Christopher R. Ulrich - 271288
      CUlrich@mpbf.com
3 | John P. Girarde - 191518
      JGirarde@mpbf.copm
4 | MURPHY, PEARSON, BRADLEY & FEENEY
    580 California Street, Suite 1100
5 | San Francisco, CA  94104-1001
    Telephone:      (415) 788-1900
6 | Facsimile:      (415) 393-8087

7 | David van Leeuwen, Esq.
    Peyrot & Associates, PC.
8 | 62 William Street, 8th Floor,
    New York, NY 10005
9 | Telephone:      (646) 650-2785
    Facsimile:      (646) 650-5109
10 |    David.vanleeuwen@peyrotlaw.com
    *(Pro Hac Vice Forthcoming)*

12 | Attorneys for Defendant
     KELEOPS USA, INC.

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEFFREY GARON, individually and on behalf of all persons similarly situated,<br><br>        Plaintiff,<br><br>       v.<br><br>KELEOPS USA, INC.,<br><br>        Defendant. | Case No.:<br><br>**DEFENDANT KELEOPS USA, INC.'S NOTICE OF REMOVAL OF CIVIL ACTION**<br><br>**[28 U.S.C. §§ 1332, 1441 AND 1446]** |

TO THE CLERK OF THE ABOVE-CAPTIONED COURT:

      NOTICE IS HEREBY GIVEN that, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, Defendant KELEOPS USA, INC. ("KELEOPS") removes the above-entitled civil action from the Superior Court of the State of California, County of Marin, to the United States District Court for the Northern District of California, based upon diversity of citizenship.

DEFENDANT KELEOPS USA, INC.'S NOTICE OF REMOVAL OF CIVIL ACTION

## I.    INTRODUCTION AND FACTUAL BACKGROUND

1.    Pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, and any other applicable authority, KELEOPS hereby gives notice of removal of the above action, *Jeffrey Garon, individually and on behalf of all persons similarly situated v. Keleops USA, Inc.*, Civil Case No. CV0004416, from the Superior Court of the State of California, County of Marin, to the United States District Court for the Northern District of California.  This matter is a class action alleging that KELEOPS violated the California Invasion of Privacy Act ("CIPA"), California Penal Code § 638.50(b).  Plaintiff's First Amended Class Action Complaint alleges that KELEOPS owns and operates a website, https://gizmodo.com (the "Website"), and that when users visit the Website, KELEOPS causes four Trackers - the Steamrail Tracker, AGKN Tracker, and Crowd Control Tracker (collectively, the "Trackers") - to be installed on Website visitors' internet browsers.  Plaintiff alleges that because the Trackers capture Website visitors' "routing, addressing, or signaling information," the Trackers constitute a "pen register" under Section 638.50(b) of the CIPA.

2.    On January 28, 2025, Plaintiff filed this First Amended Class Action Complaint against KELEOPS in the Superior Court of the State of California, County of Marin.  KELEOPS was served with Plaintiff's Summons and First Amended Class Action Complaint on January 31, 2025.  Pursuant to 28 U.S.C. § 1446(a), a true and legible copy of the First Amended Class Action Complaint is attached hereto as Exhibit A.

3.    As further set forth below, jurisdiction over this case is proper based on diversity, as complete diversity of citizenship exists between Plaintiff and the only named Defendant, KELEOPS

## II.    THE REQUIREMENTS FOR DIVERSITY JURISDICTION ARE SATISFIED

**A.    There is complete diversity of citizenship between the parties:**

4.    This is an action over which this Court has original jurisdiction under the provisions of 28 U.S.C. § 1332, and it is, therefore, one that KELEOPS may remove to this Court pursuant to 28 U.S.C. §§ 1441 and 1446.  Removal under § 1441 is appropriate when complete diversity of citizenship exists between plaintiffs and all properly joined defendants, no properly joined defendant is the citizen of California, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.    Pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, removal is proper in this action because

there is complete diversity of citizenship between Plaintiff and the only named Defendant, KELEOPS.

6.      KELEOPS is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. (First Amended Complaint, ¶8.) KELEOPS is, therefore, a citizen of the States of Delaware and New York. 28 U.S.C. § 1332(c)(1). Plaintiff resides in Fairfax, California, and is a citizen of the State of California. (First Amended Complaint, ¶7.)

7.      In class actions, only the citizenship of the named parties (the representative plaintiff and named defendants) is considered for diversity purposes; the fact that the action is maintained on behalf of other, nondiverse class members does not affect diversity jurisdiction. *Snyder v. Harris* (1969) 394 U.S. 332, 339-340.

8.      Accordingly, there is complete diversity of citizenship between the parties in this case.

9.      Pursuant to 28 U.S.C. § 1441(b), this action is removable because no party in interest properly joined and served as a defendant is a citizen of California. See 28 U.S.C. § 1441(b) [Providing that non-federal question cases "shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which the action is brought"].

**B.      The amount-in-controversy exceeds the sum or value of $75,000:**

10.      The amount-in-controversy for diversity removal is satisfied in this action.  Although the exact amount of damages being sought by Plaintiff is not alleged, it is facially apparent from the First Amended Complaint that the amount-in-controversy between Plaintiff and KELEOPS exceeds the sum or value of $75,000, exclusive of interest and costs. *Singer v. State Farm Mut. Automobile Ins. Co*., 116 F.3d 373, 376 (9th Cir. 1997).  While the court cannot just add up the damages sought by each member of the class, if least one named plaintiff satisfies the jurisdictional minimum, the other unnamed class members can, by virtue of the supplemental jurisdiction conferred on the federal district courts by 28 U.S.C. § 1367, piggyback on that plaintiff's claim. *Snyder v. Harris*, 394 U.S. 332, 336 (1969).  Here, Plaintiff's First Amended Complaint seeks statutory damages of $5,000 for *each* violation of California Penal Code § 638.50(b), and also seeks an order of restitution and all other forms of equitable monetary relief. (First Amended Complaint, pg. 43.)  Arguably, each time Plaintiff visited the Website the use of the Trackers could constitute a separate violation of § 638.50(b), and Plaintiff could arguably seek

1  statutory money damages, restitution and equitable monetary relief for each such act. (First Amended

2  Complaint, ¶24.)

3      11.    Based upon the allegations in Plaintiff's First Amended Complaint, the potential number

4  of alleged violations of the CIPA, and the nature of damages being sought by Plaintiff, KELEOPS

5  reasonably asserts that the amount-in-controversy in this action exceeds the sum or value of $75,000,

6  exclusive of interest and costs.

7      **III.    THE PROCEDURAL REQUIREMENTS OF REMOVAL ARE SATISFIED**

8      12.    This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b).  KELEOPS's

9  was served with Plaintiff's First Amended Complaint on January 31, 2025, which is less than 30 days

10  prior to the date of this Notice.

11      13.    The Northern District of California is the federal judicial district encompassing the

12  Superior Court of the State of California, County of Marin, where this suit was originally filed.  Venue

13  is therefore proper in this district under 28 U.S.C. § 1441(a).

14      14.    Jurisdiction pursuant to 28 U.S.C. § 1332 requires consent of all Defendants.  KELEOPS

15  is the only named Defendant in this action and is the party moving for removal.

16      15.    KELEOPS is providing Plaintiff with written notice of the filing of this Notice of

17  Removal as required by 28 U.S.C. § 1446(d).

18      16.    Pursuant to 28 U.S.C. § 1446(d), KELEOPS is filing a copy of this Notice of Removal

19  with the Clerk of the Superior Court of the State of California, County of Marin.  A true and correct copy

20  of the Notice of Filing is attached hereto as Exhibit "B."

21      17.    KELEOPS hereby demands a trial by jury on all issues and all counts of the Complaint.

22      Wherefore, KELEOPS hereby gives notice that the above-entitled state court action, formerly

23  pending in the Superior Court of the State of California, County of Marin, shall be removed to the United

24  States District Court for the Northern District of California.

25      Pursuant to Rule 11 of the Federal Rules of Civil Procedure, I declare that I have read the

26  foregoing; that to the best of my knowledge, based on a reasonable investigation, it is well grounded in

27  fact and is warranted by law; and that it is not interposed for any improper purpose, such as to harass or

28  to cause unnecessary delay or needless increase in the cost of litigation.

Dated: February 28, 2025                    MURPHY, PEARSON, BRADLEY & FEENEY


By ____/s/ John P. Girarde_____
John P. Girarde
Attorneys for Defendant
KELEOPS USA, INC.

JPG.5083457.docx

DEFENDANT KELEOPS USA, INC.'S NOTICE OF REMOVAL OF CIVIL ACTION

1

**CERTIFICATE OF SERVICE**

2     I, Anne G. Montastier, declare:

3     I am a citizen of the United States, am over the age of eighteen years, and am not a party to or

4     interested in the within entitled cause.  My business address is 580 California Street, Suite 1100, San

5     Francisco, California 94104.

6     On February 28, 2025, I served the following document(s) on the parties in the within action:

7

8     **NOTICE TO MARIN COUNTY SUPERIOR COURT OF DEFENDANT KELEOPS USA, INC.'S FILING OF NOTICE OF REMOVAL OF CIVIL ACTION TO THE UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA**

9

| | |
|---|---|
| X | **VIA MAIL:** I am familiar with the business practice for collection and processing of mail. The above-described document(s) will be enclosed in a sealed envelope, with first class postage thereon fully prepaid, and deposited with the United States Postal Service at San Francisco, California on this date, addressed as listed below. |
| X | **VIA E-MAIL:**  I attached the above-described document(s) to an e-mail message, and invoked the send command to transmit the e-mail message to the person(s) at the e-mail address(es) listed below.  My email address is AMontastier@mpbf.com |

15    L. Timothy Fisher                         Attorneys For Plaintiff
      Emily A. Horne                            JEFFREY GARON
16    Bursor & Fisher, P.A.
      1990 North California Boulevard, Suite 940
17    Walnut Creek, CA 94596

18    E-mail:  ltfisher@bursor.com
      Email : chorne@bursor.com
19    Phone:  (925) 300-4455
      Fax:  (925) 407-2700

20

21    I declare under penalty of perjury under the laws of the State of California that the foregoing is

22    a true and correct statement and that this Certificate was executed on February 28, 2025.

23

24

25    By _____
      Anne G. Montastier

26

27

28

NOTICE TO MARIN COUNTY SUPERIOR COURT OF DEFENDANT'S FILING OF NOTICE OF REMOVAL OF CIVIL ACTION TO THE UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA