**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
ehorne@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

JEFFREY GARON, individually and on behalf of all persons similarly situated,

Plaintiff,

v.

KELEOPS USA, INC.,

Defendant.

Case No. 4:25-cv-2124-DMR

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Date: July 10, 2025
Time: 10:00 a.m.
Courtroom: 4
Judge: Hon. Donna M. Ryu

# TABLE OF CONTENTS

PAGE


INTRODUCTION ........ 1

ARGUMENT ........ 3

I. THIRD PARTY TRACKING SOFTWARE OPERATED BY DATA BROKERS ARE "PEN REGISTERS" ........ 3

A. The Third Party Trackers Are "Pen Registers" Based On The Plain Text Of The CIPA, Which Controls ........ 3

B. The Legislative History And Expansive Scope Of The CIPA, As Set Forth By California Supreme Court Decisions Requiring The Statute To Be Interpreted Broadly, Support That The Third Party Trackers Are "Pen Registers" ........ 6

C. The Federal Pen Register Statute Has No Bearing On The CIPA, And Has Been Applied To Internet Tracking Technology Regardless ........ 8

D. Defendant's Authorities Are Unpersuasive And Distinguishable ........ 9

II. USERS' IP ADDRESSES, DEVICE FINGERPRINTS, AND UNIQUE IDENTIFIERS ARE "ROUTING," ADDRESSING," AND "SIGNALING" INFORMATION ........ 11

III. DEFENDANT IS NOT PERMITTED TO INSTALL AND USE THE THIRD PARTY TRACKERS, NOR IS DEFENDANT'S CONDUCT EXEMPT FROM THE CIPA ........ 14

A. Plaintiff's Claim Involves The Collection Of Plaintiff's Information By The Third Parties—As Caused By Defendant—And It Was Not Necessary For The Third Parties To Collect Plaintiff's Information ........ 14

B. Defendant Is Not A Provider Of An Electronic Communication Service, Nor Was The Installation Of The Third Party Trackers Necessary To Operate, Maintain, Or Test An Electronic Communication Service ........ 15

IV. THIS ACTION SHOULD NOT BE STAYED BASED ON STRONGLY OPPOSED BILL THAT MAY NOT PASS IN ITS CURRENT FORM (IF AT ALL) ........ 18

V. TO THE EXTENT THE COURT GRANTS THE MOTION (AND IT SHOULD NOT), PLAINTIFF SHOULD BE PERMITTED LEAVE TO AMEND ........ 19

CONCLUSION ........ 20

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Alicia T. v. Cnty. of Los Angeles*,
222 Cal. App. 3d 869 (Ct. App. 1990) .......... 9

*Aviles v. Liveramp, Inc.*,
2025 WL 487196 (Cal. Super. Ct. Jan. 28, 2025) .......... 10

*Benson v. Double Down Interactive, LLC*,
798 F. App'x 117 (9th Cir. 2020) .......... 17

*Columbia Pictures Indus. v. Bunnell*,
2007 WL 2080419 (C.D. Cal. May 29, 2007) .......... 14

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) .......... 1, 5, 11

*Droesch v. Wells Fargo Bank, N.A.*,
2021 WL 1817057 (N.D. Cal. May 6, 2021) .......... 3, 18

*Flanagan v. Flanagan*,
27 Cal. 4th 766 (2002) .......... 6

*Gladstone v. Amazon Web Servs., Inc.*,
739 F. Supp. 3d 846 (W.D. Wash. 2024) .......... 5, 7

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) .......... passim

*Heiting v. FKA Distributing Co.*,
2025 WL 736594 (C.D. Cal. Feb. 3, 2025) .......... passim

*In re Google Inc.*,
2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) .......... 11

*In re Hulu Privacy Litig.*,
2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) .......... 17

*Jackson v. Fandom, Inc.*,
2023 WL 4670285 (N.D. Cal. July 20, 2023) .......... 18

*Jackson v. Hill*,
2021 WL 12301887 (C.D. Cal. Oct. 20, 2021) .......... 18

*James v. Walt Disney Co.*,
701 F. Supp. 3d 942 (N.D. Cal. 2023) .......... 5

*Javier v. Assurance IQ, LLC*,
2022 WL 1744107 (9th Cir. May 31, 2022) .......... 7

*Jones v. Ford Motor Co.*,
85 F.4th 570 (9th Cir. 2023) .......... 8

*Lesh v. Cable News Network, Inc.*,
2025 WL 563358 (S.D.N.Y. Feb. 20, 2025) .......... passim

*Licea v. Hickory Farms LLC*,
2024 WL 1698147 (Cal. Super. Ct. Mar. 13, 2024) .......... 7, 10

*Lopez v. Smith,*
203 F.3d 1122 (9th Cir. 2000) .......... 20

*Matera v. Google Inc.*,
2016 WL 8200619 (N.D. Cal. Aug. 12, 2016) .......... 6

*Mirmalek v. Los Angeles Times Communications LLC*,
2024 WL 5102709 (N.D. Cal. Dec. 12, 2024) .......... passim

*Moody v. C2 Educational Systems Inc.*,
742 F. Supp. 3d 1072 (C.D. Cal. 2024) .......... passim

*People v. Blair*,
25 Cal. 3d 640 (1979) .......... 11

*Pires v. Heller*,
2004 WL 2711075 (S.D.N.Y. Nov. 24, 2004) .......... 8

*Rodriguez v. Autotrader.com, Inc.*,
762 F. Supp. 3d 921 (C.D. Cal. 2025) .......... passim

*Roney v. Miller*,
705 F. App'x 670 (9th Cir. 2017) .......... 19

*Salazar v. National Basketball Association*,
118 F.4th 533 (2d Cir. 2024) .......... 11

*Sanchez v. Cars.com Inc.*,
2025 WL 487194 (Cal. Super. Ct. Jan. 27, 2025) .......... 10

*Sgouros v. TransUnion Corp.*,
817 F.3d 1029 (7th Cir. 2016) .......... 7

*Shah v. Fandom, Inc.*,
754 F. Supp. 3d 924 (N.D. Cal. 2024) .......... passim

*Tate v. VITAS Healthcare Corp.*,
762 F. Supp. 3d 949 (E.D. Cal. 2025) .......... 5

*TBG Ins. Serv. Corp. v. Super. Ct.*,
96 Cal. App. 4th 443 (2002) .......... 7

*Turner v. Nuance Communications, Inc.*,
735 F. Supp. 3d 1169 (N.D. Cal. 2024) .......... 15

*United States v. Corinthian Colleges*,
655 F.3d 984 (9th Cir. 2011) .......... 20

*United States v. Forrester*,
512 F.3d 500 (9th Cir. 2008) .......... 8, 12

*United States v. Soybel*,
13 F.4th 584 (7th Cir. 2021) .......... 8

*United States v. Ulbricht*,
858 F.3d 71 (2d Cir. 2017) .......... 8

*United States v. United Healthcare Ins. Co.*,
848 F.3d 1161 (9th Cir. 2016) .......... 19

*Valentine v. NebudAd, Inc.*,
804 F. Supp. 2d 1022 (N.D. Cal. 2011) .......... 9

*Venckiene v. United States*,
929 F.3d 843 (7th Cir. 2019) .......... 18, 19

*Zarif v. Hwareh.com, Inc.*,
2025 WL 486317 (S.D. Cal. Feb. 13, 2025) .......... 1, 4, 15

**STATUTES**

18 U.S.C. § 3121 .......... 8

Cal. Civ. Code § 1798.140(v) .......... 13

Cal. Pen. Code § 630 .......... 8

Cal. Pen. Code § 631 .......... 15

Cal. Pen. Code § 638.50 .......... passim

Cal. Pen. Code § 638.51 .......... passim

Cal. Pen. Code § 638.52 .......... 6

Cal. Pen. Code § 1546 .......... 16

**RULES**

Cal. R. Ct. 8.1115(a) .......... 9

Cal. R. Ct. 8.1115(b)(1)-(2) .......... 9

**OTHER AUTHORITIES**

Assembly Bill 929 .......... 7

Senate Bill 690 .......... 3, 18, 19

Plaintiff Jeffrey Garon ("Plaintiff") respectfully submits this opposition to Defendant Keleops USA, Inc.'s ("Defendant") Motion to Dismiss the First Amended Complaint (ECF No. 16) (the "Motion" or "MTD").

**INTRODUCTION**

Federal courts in this District and elsewhere have universally rejected every argument Defendant makes in its Motion. *See generally Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924 (N.D. Cal. 2024); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709 (N.D. Cal. Dec. 12, 2024); *Moody v. C2 Educational Systems Inc.*, 742 F. Supp. 3d 1072 (C.D. Cal. 2024); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024 (S.D. Cal. 2023); *Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921 (C.D. Cal. 2025); *Heiting v. FKA Distributing Co.*, 2025 WL 736594 (C.D. Cal. Feb. 3, 2025); *Zarif v. Hwareh.com, Inc.*, 2025 WL 486317 (S.D. Cal. Feb. 13, 2025); *Lesh v. Cable News Network, Inc.*, --- F. Supp. 3d ---, 2025 WL 563358 (S.D.N.Y. Feb. 20, 2025). There is good reason for this. Defendant seeks to insert words into the text of Sections 638.50-638.51 of the California Invasion of Privacy Act (the "CIPA") that do not exist, and construe broad terms narrowly and without acknowledging California Supreme Court precedent requiring just the opposite. But as court after court has held, "the text of a law controls over purported legislative intentions unmoored from any statutory text." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024). Thus, "the Court's analysis must begin with the statutory text, and if that text is clear, must end there." *Shah*, 754 F. Supp. 3d at 929.

The text of the CIPA is clear here. The CIPA defines a "pen register" broadly as a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Pen. Code § 638.50(b). As the authorities Plaintiff cites above have held, this definition applies to software installed on website users' browsers and operated by third parties that collect users' IP addresses and other information, like browser and device type. Plaintiff alleges facts in line with those holdings here. *See*, *e.g.*, First Amended Complaint (ECF No. 1 at Ex. A) (the "FAC") ¶¶ 2, 32.

There is something different about Plaintiff's allegations here though: they allege a far more invasive course of conduct by Defendant than in other cases brought under CIPA § 638.51. Two of the Trackers[1] that Defendant installs on Website users' browsers here are operated by registered data brokers—Neustar and Lotame. FAC ¶ 59. Neustar and Lotame's collection of Website users' information enables them and Defendant to de-anonymize and identify Website users by linking their information like IP addresses to comprehensive profiles of users that these entities maintain. *Id.* ¶¶ 54-55, 60-61, 66-68. This conduct is in and of itself harmful, as governmental organizations from the FTC to NATO have found. *Id.* ¶¶ 63-65. But it is compounded by the fact that Neustar, Lotame, and ironSource—the other Third Party whose Tracker Defendant installs—then sell these comprehensive user profiles in real-time auctions to advertisers, a process known as "real time bidding." *Id.* ¶¶ 71-74. During this process, the information held that is collected directly from Website users is linked to the profiles held by data brokers like Neustar and Lotame, enriching the value of Website users' data and allowing their data to be sold for a higher price to advertisers. *Id.* ¶ 75. Defendant, obviously, profits from this arrangement, as the more valuable and more identifiable its users are, the more money it makes from the sale of Website user data through real-time bidding. *Id.* ¶¶ 79-81. And the real-time bidding process also causes significant harm to users. *Id.* ¶¶ 77-78. Indeed, as some privacy scholars have noted, what occurs on Defendant's Website is "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information.[2]

So, this case is not just about Third Parties who collect Website users' IP addresses. It is about Defendant placing the Trackers of data brokers on users' Website browsers to de-anonymize and identify them, so that the users' data can be sold to advertisers for more money in real-time auctions, which results in greater profits for Defendant. FAC ¶¶ 79-81. Defendant's installation and use of the Trackers expose Website users to incredibly invasive privacy harms in the span of milliseconds. *Id.* ¶¶ 63-65, 77-78; *see also Mirmalek*, 2024 WL 5102709, at *4 ("Plaintiff has plausibly alleged that she was injured by being tracked across multiple visits for marketing and

---

[1] All capitalized terms not otherwise defined herein shall have the same meaning as in the FAC.

[2] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

advertising purposes, and that she did not expect or agree to such tracking.") (cleaned up). And all of this, Plaintiff alleges, is done without Website users' consent. FAC ¶¶ 141, 155. This is the conduct that Plaintiff alleges violates the CIPA.

On the other side, Defendant hopes that the California State Legislature will give its privacy-invasive conduct a free pass with California Senate Bill 690 ("SB 690"). That bill would add a retroactive "commercial business purposes" exception to several provisions of the CIPA that may excuse Defendant's conduct here.[3] As discussed below, there are numerous issues with and strong opposition to SB 690. Given this, as well as other compounding factors, there is no reason to stay this action, as Defendant requests, based on a bill that may hypothetically pass, on the belief that the bill will hypothetically keep the same language as the current proposal. *Droesch v. Wells Fargo Bank, N.A.*, 2021 WL 1817057, at *6 (N.D. Cal. May 6, 2021).

For the reasons set forth below, Defendant's Motion should be denied.[4]

## ARGUMENT

### I. THIRD PARTY TRACKING SOFTWARE OPERATED BY DATA BROKERS ARE "PEN REGISTERS"

#### A. The Third Party Trackers Are "Pen Registers" Based On The Plain Text Of The CIPA, Which Controls

Defendant argues that the Trackers are not "pen registers" because "[n]othing in the Penal Code extends a pen register to software." MTD at 10:26. Federal courts adjudicating these claims beg to differ.

CIPA § 638.50(b) defines a "pen register" as a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

---

[3] BILL TEXT: CA SB690, https://legiscan.com/CA/text/SB690/id/3186917.

[4] In a footnote, Defendant staztes that it is "neither the owner nor operator of Gizmodo.com," but rather, "the sole member of Gizmodo USA LLC, the American entity owning and operating" the Website. MTD at 7 n.1. Defendant has not moved to dismiss based on Plaintiff naming the wrong party, nor could it. That is because whether an entity owns and operates the Website is not necessarily synonymous with whether an entity "installed" or "used" the Trackers, as the CIPA prohibits. If Defendant negotiated the contracts and/or integrated the Trackers' code into the Website, as Plaintiff alleges (FAC ¶ 32), then Defendant can be said to have "installed" the Trackers. And if Defendant derives advertising revenue from the Trackers through the real-time bidding process, as Plaintiff alleges (FAC ¶¶ 79-81), then Defendant can be said to have "used" the Trackers.

"Nothing in the statutory definition limits pen registers to those that operate the same way as a traditional phone pen register." *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 929 (N.D. Cal. 2024). On the contrary, the "California Legislature's chose[]" "expansive language" for the definition of a "pen register" that "the Court cannot ignore," language that is "specific as to the type of data [collected]," but "vague and inclusive as to the form of the collection tool" (*i.e.* "device or process"). *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

Thus, federal courts have universally held that online trackers or tracking software such as the Trackers at issue here are "pen registers." *See*, *e.g.*, *Shah*, 754 F. Supp. 3d at 929 (agreeing with "[p]laintiffs' theory [] that the third-party Trackers operate as pen registers under the meaning of the statute because they are processes that record users' IP addressing information"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3 (N.D. Cal. Dec. 12, 2024) ("[U]nder the inclusive language of CIPA's definition of a pen register, Plaintiff sufficiently alleges that the Trackers are a 'device or process…'"); *Moody v. C2 Educational Sys. Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51.") *Greenley*, 684 F. Supp. 3d at 1050 (finding software constituted a "pen register"); *Heiting v. FKA Distributing Co.*, 2025 WL 736594, at *3 (C.D. Cal. Feb. 3, 2025) (same); *Zarif v. Hwareh.com, Inc.*, 2025 WL 486317, at *12 (S.D. Cal. Feb. 13, 2025) (same); *Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921, 929 (C.D. Cal. 2025) (same); *Lesh v. Cable News Network, Inc.*, --- F. Supp. 3d ---, 2025 WL 563358, at *3 (S.D.N.Y. Feb. 20, 2025) (same).

The Trackers here are "pen registers," either because they are "processes" or "devices." As to "processes," courts have held this term encompasses "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley*, 684 F. Supp. 3d at 1050. Plaintiff alleges the Trackers do exactly that here—that the Trackers are operated by data brokers who use the Trackers (in conjunction with Defendant) to de-anonymize and identify consumers through the information they collect from Website users, combine that information into comprehensive profiles, and ultimately sell those profiles to numerous advertisers through the real-time bidding process. FAC ¶¶ 54-55, 59, 66-69, 74-76, 79-81, 125, 127-130, 131-136.

As to "devices," "[i]t is far from clear that the plain and ordinary meaning of 'device' is limited to a physical or tangible object" and cannot include software. *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 958 (N.D. Cal. 2023). Indeed, a contrary ruling would "ignore[] the fundamental fact that, in order for software to work, it must be run on some kind of computing device." *Id*. It is artificial to claim that software must be viewed in isolation from the computing device on which it runs and with which it is inseparable in regard to the challenged conduct." *Id*. For that reason, courts have regularly construed other provisions of the CIPA that employ the word "device"—and where, like here, that term is not qualified by other language—to cover software. *See*, *e.g.*, *Gladstone v. Amazon Web Servs., Inc.*, 739 F. Supp. 3d 846, 856 (W.D. Wash. 2024) ("[T]he Court finds that 'device,' as used in [CIPA] Section 632, can include software."); *Tate v. VITAS Healthcare Corp.*, 762 F. Supp. 3d 949, 958 (E.D. Cal. 2025) (same). Moreover, the statute's use of the "electronic communications" in defining a pen register suggests that software can fall under the definition. *See* Cal. Pen. Code § 638.50(b).

Defendant takes its argument one step further, arguing that a "pen register" must be a "device[] attached to phones" based on its selective reading of legislative intent. MTD at 10:19; *see also id.* ("The device or process required under Section 638.50 must be tied to telephonic functionality…") (cleaned up). But neither the word "phone" nor "telephone functionality" appears anywhere in the definition of a "pen register." Cal. Pen. Code § 638.50; *see also Lesh*, 2025 WL 563358, at *4 ("The statutory text includes no limitation to information transmitted by telephone or over a phone line."). On the contrary, the text of the statute is not only broad (*Greenley*, 684 F. Supp. 3d at 1050), it expressly contemplates technology beyond telephones vis-à-vis defining "pen registers" as including devices or processes that capture "wire *or* electronic communications[s]." Cal. Pen. Code § 638.50(b) (emphasis added); *see also Lesh*, 2025 WL 563358, at *4 ("[T]he definition of pen register in CIPA encompasses a variety of 'electronic communications.'"). And ultimately, "the text of a law controls over purported legislative intentions unmoored from any statutory text" and "the Court may not replace the actual text with speculation as to Congress' intent." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024); *see also Shah*, 754 F. Supp. 3d at 929 ("[T]he Court's analysis must begin with the statutory text, and if that text is

clear, must end there."). Thus, the Court must apply the CIPA as written and reject Defendant's attempt to introduce terms into the statute.

To support its position, Defendant cites to Cal. Pen. Code § 638.52, which states that "a pen register may not collect the physical location of the subscriber except to the extent that the location may be determined from the telephone number." MTD at 10:20-23 (cleaned up). Defendant claims the Court should look to this provision "to find that the Act applie[s] only to mechanical, telephone number-tracing technology." *Id.* at 13:8-9. "Section 638.52, however, merely lists requirements relating to a particular type of pen register: one that is installed on a telephone line … But that does not alter the statutory definition of a pen register stated in § 638.50(b) or the prohibition on non-law enforcement use of such pen registers." *Shah*, 754 F. Supp. 3d at 930; *see also Moody*, 742 F. Supp. 3d at 1076 ("Though § 638.52 refers to pen registers and trap and trace devices as physically attached to telephone lines, the definitions set forth under § 638.50 do not state any such requirement."); *Lesh*, 2025 WL 563358, at *4 (rejecting same argument as Defendant brings here and noting "[t]he Court will not read the term 'telephone' into Section 638.50 just because the word is used in another section of the statute that bears little relevance here").

**B. The Legislative History And Expansive Scope Of The CIPA, As Set Forth By California Supreme Court Decisions Requiring The Statute To Be Interpreted Broadly, Support That The Third Party Trackers Are "Pen Registers"**

Even incorporating legislative intent, Defendant is still wrong. "CIPA was passed, in part, because 'the development of new devices and techniques for the purpose of eavesdropping upon private communications [] has created a serious threat to the free exercise of personal liberties.'" *Lesh*, 2025 WL 563358, at *4 (quoting Cal. Pen. Code § 630). "In light of this intent, the California Supreme Court has instructed courts to interpret CIPA in the manner that 'fulfills the legislative purpose of CIPA by giving greater protection to privacy interests.'" *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016) (Koh, J.) (quoting *Flanagan v. Flanagan*, 27 Cal. 4th 766, 775 (2002)). "As such, courts have repeatedly held that [the] provisions of CIPA are not limited to the traditional versions of the tools at issue, based on the plain language of the statute, the California Supreme Court's pronouncements regarding the broad legislative intent underlying CIPA

to protect privacy, and the California courts' approach to updating obsolete statutes in light of emerging technologies." *Shah*, 754 F. Supp. 3d 930-31 (cleaned up); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications."); *Gladstone*, 739 F. Supp. 3d at 856 ("[T]he Court finds that 'device,' as used in [CIPA] Section 632, can include software.").

Defendant ignores this legislative history and cites to Assembly Bill 929, "the genesis of CIPA § 638.51." MTD at 13:4. "Those materials, however, merely describe traditional telephone-based pen registers as being among the variety of electronic tools used by law enforcement "to apprehend criminals in this age of rapidly changing technology." *Shah*, 754 F. Supp. 3d at 930 n.2. "Nowhere in those materials did the Legislature state an intent to add a statutory requirement limiting pen registers to those traditional forms." *Id*.

Defendant also contends that "allowing Plaintiff's claim to proceed would have a sweeping effect upon the common use of the Internet." MTD at 13:24-25 (citing *Licea v. Hickory Farms LLC*, 2024 WL 1698147, at *4 (Cal. Super. Ct. Mar. 13, 2024). Of course, the Internet has not stopped functioning since *Greenley* was issued nearly two years ago, nor any of the decisions issued since that agree with Plaintiff's arguments here. This is so because Defendant is not *per se* precluded from installing the Third Parties' Trackers; it simply must procure its users' prior consent to do so. *See Lesh*, 2025 WL 563358, at *6-7 (evaluating, although rejecting, consent defense to a CIPA § 638.51 claim); *see also TBG Ins. Serv. Corp. v. Super. Ct.*, 96 Cal. App. 4th 443, 450 n.5 (2002) ("Zieminski's consent [i]s a complete defense to his invasion of privacy claim."). "This is not hard to accomplish, as the enormous volume of commerce on the Internet attests." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1036 (7th Cir. 2016). And "[t]o the extent that [Defendant] believes the statute may impose too many burdens when applied to the realities of modern technologies … the question of whether the statute's scope should be narrowed ultimately rests with the Legislature, not the courts." *Shah*, 754 F. Supp. 3d at 933.

But to be clear, the policy objective that CIPA promotes is protecting Californians from "the invasion of privacy resulting from the continual and increasing use of [] devices and techniques" created by "advances in science and technology," which have "created a serious threat to the free

exercise of personal liberties" that "cannot be tolerated in a free and civilized society." Cal. Pen. Code § 630. The CIPA—including § 638.51—"reflects the Legislature's judgment that an individual's consent is required before others may track certain addressing information in their electronic communications for non-law enforcement purposes." *Shah*, 754 f. Supp. 3d at 933. That policy objective is at issue here, where Defendant is enabling data brokers to build comprehensive profiles of users that are sold for Defendant's financial benefit by installing the Third Parties' Trackers on its Website, all of which is being done *without* consent here and which has caused actual and concrete harm to Plaintiff and other Website users. *See*, *e.g.*, FAC ¶¶ 63-65, 77-81, 141, 155, 157. Indeed, Defendant concedes such harm occurred here by removing this action to federal court, thereby conceding Article III standing. *See* ECF No. 1; *Jones v. Ford Motor Co.*, 85 F.4th 570, 573 (9th Cir. 2023) ("Upon removal, the burden to demonstrate Article III jurisdiction shifts to the Defendant as the party invoking federal jurisdiction.") (cleaned up); *Pires v. Heller*, 2004 WL 2711075, at *3 (S.D.N.Y. Nov. 24, 2004) ("[I]t is *Defendants'* burden to establish the existence of federal subject matter jurisdiction upon removal, not the Plaintiff.") (emphasis in original). So, any policy Defendant cites—which can be easily resolved by procuring users' prior consent—must be weighed against the serious invasion of privacy that has and will continue to occur based on Defendant's conduct, and which the CIPA seeks to prevent.

### C. The Federal Pen Register Statute Has No Bearing On The CIPA, And Has Been Applied To Internet Tracking Technology Regardless

Defendant also cites to the "federal Pen Register Act [18 U.S.C. § 3121]" to support its position that the CIPA only applies to telephonic pen registers. MTD at 13:7-9. But the federal pen register act has been applied to monitoring internet communications. *See United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) ("We conclude that the surveillance techniques [that reveal IP addresses] are constitutionally indistinguishable from the use of a pen register."); *United States v. Soybel*, 13 F.4th 584, 586-87 (7th Cir. 2021) (pen register installed under federal statute "to monitor internet traffic in and out of the building generally and Soybel's unit specifically"); *United States v. Ulbricht*, 858 F.3d 71, 83 (2d Cir. 2017) (same "to monitor Internet Protocol ('IP') address traffic to and from various devices associated with Ulbricht"). Regardless, as the *Lesh* court held:

> [Defendant's] argument that the *federal* Pen[] Register Act is limited to information transmitted on telephone lines – and thus CIPA should be limited to telephone lines – is without merit. [Plaintiff] does not bring any claims under the federal Pen[] Register Act and, as explained above, CIPA broadly defines "pen register." The Court will not use a similar federal statute so as to read a requirement into the text of a California statute.

*Lesh*, 2025 WL 563358, at *5 (emphasis in original); *Moody*, 742 F. Supp. 3d at 1076 (rejecting argument that limitations in federal pen register statute should be applied to California law). Thus, even if the federal pen register law was limited to telephonic devices (and it is not), that would have no bearing on the CIPA. Indeed, the ECPA—which encompasses the federal pen register law—does not preempt more protective state laws. *Valentine v. NebudAd, Inc.*, 804 F. Supp. 2d 1022, 1029 (N.D. Cal. 2011) ("[T]he ECPA does not preempt the CIPA.").

**D. Defendant's Authorities Are Unpersuasive And Distinguishable**

Finally, Defendant also cites to a handful of state court cases and claims "the Court should look to th[ose] state court decisions … rather than federal court decisions to the contrary in attempting to predict how the California Supreme Court might decide the issue." MTD at 11:19-22. Defendant, of course, does not address any of these "federal court decisions" other than *Greenley*.[5] And not only are state trial court decisions also just predicting how the California Supreme Court will rule, such decisions are even not citable in California state courts and have no precedential value. *See* Cal. R. Ct. 8.1115(a) ("[A]n opinion of a California Court of Appeal or superior court appellate division that is not certified for publication or ordered published must not be cited or relied on by a court or a party in any other action."). In fact, citing an unpublished case in California state courts, unless the opinion meets a narrow set of criteria not applicable here, can be sanctionable.[6] *See*, *e.g.*, *Alicia T. v. Cnty. of Los Angeles*, 222 Cal. App. 3d 869, 885 (Ct. App. 1990), *modified* (Aug. 16,

---

[5] Defendant attempts to distinguish *Greenley* because that decision involved "software installed in a telephone." MTD at 11:15. To be more accurate, *Greenley* involved software "embedded … in third-party apps" (*i.e.*, applications downloaded onto a smartphone). *Greenley*, 684 F. Supp. 3d at 1035. Regardless, *Greenley* did not couch its analysis as strictly limited to telephones. Instead, it noted generally that "pen registers take the form of software" and focused on the broad language of the statute. *Id.* at 1050.

[6] An unpublished opinion is citable under certain circumstances in a "criminal or disciplinary action," or "[w]hen the opinion is relevant under the doctrines of law of the case, res judicata, or collateral estoppel." *See* Cal. R. Ct. 8.1115(b)(1)-(2).

1990) (sanctions imposed where, among other misconduct, "the T. family's counsel cited the unpublished case eight times in the reply brief and discussed it for four pages"). Thus, there is no reason to give the state court decisions Defendant cites any more persuasive value solely because they were issued by state courts. *Autotrader.com*, 762 F. Supp. 3d at 929 ("The fact that a California Superior Court concluded differently, while persuasive, is not binding and does not foreclose the possibility that software may qualify as a pen register or trap and trace device under California law, at least at the pleading stage."). Instead, each of the state court decisions Defendant cites to should be accorded value based on their actual analysis (or lack thereof).

To that end, there are several reasons to find the authorities cited by Plaintiff here are more persuasive, and that the state court cases are distinguishable regardless. As an initial matter, in *Aviles v. Liveramp, Inc.*, 2025 WL 487196, at *3 (Cal. Super. Ct. Jan. 28, 2025), the defendant did "not argue that software cannot be a pen register or trap and trace device." Instead, the *Aviles* court focused on whether IP addresses are "routing, addressing, or signaling information." IP addresses are "routing, addressing, or signaling information" for the reasons explained below. Argument § II, *infra*. But the *Aviles* court still agreed with Plaintiff that "the statutory definition of a pen register now includes electronic communications in mediums *other than simply telephone communications*." *Aviles*, 2025 WL 487196, at *2 (emphasis added). And in *Licea*, 2024 WL 1698147, at *4, the court ruled that plaintiff's claim "lacked factual support [] under the [demurrer] standard." Thus, the deficiency of the claim did not hinge on whether the alleged pen register device was a telephonic device. Rather, the deficiency of the claim was the result of a "conclusively pled complaint." *Id.*

Regardless, *Licea* and *Sanchez v. Cars.com Inc.*, 2025 WL 487194 (Cal. Super. Ct. Jan. 27, 2025), couched their holdings almost entirely in legislative history. *Sanchez*, 2025 WL 487194, at *3 (finding "the legislative history of the CIPA suggests that 'pen register' … refers to devices or processes that are used to record … information from telephone numbers"); *Licea*, 2024 WL 1698147, at *3 ("Legislative updates and commentary continue to explicitly cover cordless and cellular phone technology without reference to internet based communications."). This defies the first commandment of statutory interpretation: that "the text of a law controls over purported legislative intentions unmoored from any statutory text" and "the Court may not replace the actual

text with speculation as to Congress' intent." *Corner Post*, 603 U.S. at 815; *see also Shah*, 754 F. Supp. 3d at 929 ("[T]he Court's analysis must begin with the statutory text, and if that text is clear, must end there."). And because the text is clear here, the Court must apply the statute as written and accord the decisions analyzing the text first the most weight. Argument § I.A., *supra*. Regardless, the *Licea* and *Sanchez* courts also ignored the countervailing legislative history regarding CIPA's expansive scope, including proclamations by the California Supreme Court instructing California courts to read the CIPA broadly. Argument § I.B., *supra*. Instead, *Licea* and *Sanchez* made the same erroneous conclusions based on the cited legislative history that the *Shah*, *Moody*, and *Lesh* courts rejected.

Last, some of the cases Defendant cites to cite in turn to *People v. Blair*, 25 Cal. 3d 640, 654 n.11 (1979), which noted in passing that "[a] pen register is a mechanical device which records the numbers dialed from a telephone." Of course, a case decided in 1979 before the advent of the Internet would not reference this technology. And *Blair* did not involve the CIPA at all, much less the pen register provision, which was enacted in 2015 and clearly contemplated non-telephonic (*i.e.*, electronic) communications. Regardless, *Blair* does not contradict the California Supreme Court's later edicts to "updat[e] obsolete statutes in light of emerging technologies." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013) (Koh, J.); *cf. Salazar v. National Basketball Association*, 118 F.4th 533, 553 (2d Cir. 2024) ("The [Video Privacy Protection Act] is no dinosaur statute. Congress deployed broad … showing it did not intend for the VPPA to gather dust next to our VHS tapes."). So, all *Blair* supports is that, in 1979, a pen register included mechanical devices. It did not involve the CIPA or otherwise forever limit the CIPA's application to only technology that existed decades ago.

For each of these reasons, to the extent *Licea*, *Sanchez*, and *Aviles* are similar to this case (they are not), they should be accorded less persuasive weight.

## II. USERS' IP ADDRESSES, DEVICE FINGERPRINTS, AND UNIQUE IDENTIFIERS ARE "ROUTING," ADDRESSING," AND "SIGNALING" INFORMATION

Defendant also contends that the Trackers are not pen registers because they do not record "outgoing routing, dialing, or signaling information." MTD at 9:13-14. This is incorrect.

*First*, Plaintiff alleges the Trackers record Website users' IP addresses. FAC ¶¶ 2, 87, 97, 109. As numerous courts have held, IP addresses constitute "routing, addressing, or signaling information" under the CIPA.[7] *See*, *e.g.*, *Shah*, 754 F. Supp. 3d at 929 ("[T]he IP addresses collected by the Trackers fall within the statutory definition of 'addressing' information."); *Mirmalek*, 2024 WL 5102709, at *4 ("Plaintiff adequately alleges that the Trackers record addressing information in the form of IP addresses."); *Lesh*, 2025 WL 563358, at *4 ("[T]he IP addresses collected by the Trackers qualify as 'addressing information' under the statute."). Indeed, the Ninth Circuit held almost twenty years ago that "IP addresses constitute addressing information" under the federal pen register act. *Forrester*, 512 F.3d at 511. This is so because IP addresses "determine[] the general geographic coordinates of the user who is accessing a website" (*i.e.*, "addressing" information), and are "sending or directing the user's communication from the router in their home or work to the website they are communicating with" (*i.e.*, "routing" or "signaling" information). FAC ¶¶ 45-46.

*Second*, Plaintiff alleges other information that the Third Party Trackers record or decode—the Device Fingerprints and unique user identifiers—that also constitute "addressing" information. *See*, *e.g.*, FAC ¶¶ 2, 5, 31, 88, 98, 109 ("cookie" and "user-agent" strings in Figure 9 show unique identifiers and Device Fingerprints, respectively, being collected by Lotame through its Crowd Control Tracker), 110, 138; *see also Moody*, 742 F. Supp. 3d at 1077 (finding "device and browser information" "fall within the scope of the statute). All three pieces of information—IP addresses, Device Fingerprints, and unique user identifiers—thus constitute "addressing" information because they are used by the Third Parties to de-anonymize and identify Website users by using those pieces of information to match Website users to comprehensive profiles. *Id.* ¶¶ 5, 54, 66-68, 76, 80, 125, 127, 129, 133-136, 139; *see also Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register); *Heiting*, 2025 WL 736594, at *3 (finding software "that identifies the source of visitors to Defendant's website" is a pen register). Or, in other words, if someone's name would be "addressing" information because it allows for the identification of a user, then so should

[7] Notably, Defendant leaves out the word "addressing" in citing to the definition of a "pen register" under the CIPA. *Compare* MTD at 9:14 ("routing, dialing, or signaling information"); *with* Cal. Pen. Code § 638.50(b) ("'Pen register' means a device or process that records or decodes dialing, routing, *addressing*, or signaling information…") (emphasis added).

information that can be linked to a name and thus identify a user. *Cf.* Cal. Civ. Code § 1798.140(v) (defining "personal information" as including information "reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household").

*Finally*, all this information constitutes "information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication" and thus falls under the pen register umbrella. *Mirmalek*, 2024 WL 5102709, at *4 (cleaned up) (citing Cal. Pen. Code § 638.50(b)). Defendant argues that "[r]ecording an IP address is not equivalent to recording the numbers dialed from a phone," and therefore, the Trackers are not pen registers because they only record "information relating to the source of an outgoing communication, not where that communication is routed." MTD at 9:12-13, 9:21-22. But "[n]othing in the statutory definition limits pen registers to those that operate the same way as a traditional phone pen register." *Shah*, 754 F. Supp. 3d at 929. So, as the *Shah* court held:

> [b]y the plain meaning of § 638.50(b), collection of the recipient phone number or IP address is not a required element. All that is required is that the Trackers record addressing information *transmitted by the user's computer or smartphone in connection with the outgoing HTTP request to [Defendant's] website*, regardless of whether that addressing information pertains to the sender or the recipient of the communication at issue.

*Id.* (emphasis added). Plaintiff here has "so alleged." *Id.*; *see also*, *e.g.*, FAC ¶¶ 87, 97, 109, 138; *Mirmalek*, 2024 WL 5102709, at *4 ("Plaintiff alleges that the instruments or facilities are users' computers or smartphones. Additionally, Plaintiff alleges that users' devices transmit electronic communications in the form of Hypertext Transfer Protocol [] or GET requests to load Defendant's website.) (cleaned up); *Lesh*, 2025 WL 563358, at *4 ("Such Trackers prompt the browser to send the user's IP address. These facts adequately allege the transmission of an electronic communication."); *Heiting*, 2025 WL 736594, at *3 (finding software was a pen register where it "identifie[d] the source of visitors to Defendant's website"); *Moody*, 742 F. Supp. 3d at 1077 (same where software collected "browser and device data sent automatically upon visiting the Website.").

In sum, the Trackers are pen registers because they record and decode users' IP addresses, Device Fingerprints, and unique user identifiers, which are "routing, addressing, or signaling

information transmitted by an instrument or facility [Website users' computers] from which a wire or electronic communication is transmitted." Cal. Pen. Code § 638.50(b).

## III. DEFENDANT IS NOT PERMITTED TO INSTALL AND USE THE THIRD PARTY TRACKERS, NOR IS DEFENDANT'S CONDUCT EXEMPT FROM THE CIPA

### A. Plaintiff's Claim Involves The Collection Of Plaintiff's Information By The Third Parties—As Caused By Defendant—And It Was Not Necessary For The Third Parties To Collect Plaintiff's Information

Defendant makes several points that all boil down to the argument that Defendant itself, as a website operator, is permitted to collect Website users' IP addresses. *See* MTD at 14:12 ("Fundamentally, any website provider must collect IP addresses to operate a website."). This premise is inapplicable to the facts of this case.

As an initial matter, Plaintiff's claim is *not* that Defendant itself collected Website users' personal information. Instead, it is that by installing the Trackers, Defendant caused the *Third Parties* to collect that information—and indeed, that Defendant did this for its own financial benefit. *See*, *e.g.*, FAC ¶¶ 2, 30-32, 82-83, 87-88, 97-98, 109-110. "A user who consents to disclose their IP address to [Defendant] as part of accessing its website does not necessarily consent to disclose their IP address [and other information] to the third parties operating the Trackers." *Shah*, 754 F. Supp. 3d at 931; *see also Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921, 930 (C.D. Cal. 2025) (rejecting same argument Defendant makes here where the plaintiff alleged her "information was sent to third parties, not just Defendant").[8] And Defendant has not and cannot show that Plaintiff consented to the collection of his IP address and other information by the Third Parties, as is Defendant's burden, and Plaintiff alleges he and other users did not consent. *See*, *e.g.*, FAC ¶¶ 141, 157; *see also Shah*, 754 F. Supp. 3d at 931 ("Fandom, however, bears the burden to establish consent and, on a motion to dismiss, would be required to show that the allegations of the complaint established consent as a matter of law."); *Heiting*, 2025 WL 736594, at *4 ("Defendant bears the burden of establishing consent.").

---

[8] For this reason, Defendant's citation to *Columbia Pictures Indus. v. Bunnell*, 2007 WL 2080419 (C.D. Cal. May 29, 2007), is inapposite, as that case involved the collection of IP addresses by the website itself, not third parties as here. *See Shah*, 754 F. Supp. 3d at 932 n.3 (distinguishing authorities similar to *Bunnell* as "involve[ing] situations where users were directly communicating with the party alleged to be operating the pen register and voluntarily sent that party their IP address").

Indeed, as this Court noted in adjudicating a claim under Cal. Pen. Code § 631, there is a difference between a party to the communication recording user information, and an undisclosed third party doing the same. *See Turner v. Nuance Communications, Inc.*, 735 F. Supp. 3d 1169, 1181 (N.D. Cal. 2024) (Ryu, J.) (finding dispute of fact as to consent because "Plaintiffs argue that the language of the DAA only discloses that Chase, not third parties, may record consumers' voices"). The latter situation is what Plaintiff's claim focuses on here.

In addition, "Plaintiff alleges that the tracking software captured more than just [his] IP address." *Autotrader.com*, 762 F. Supp. 3d at 930. Specifically, Plaintiff alleges his "operating system information, browser information," and unique user identifiers were also "sent to third parties." *Id.*; *see also Moody*, 742 F. Supp. 3d at 1076-77 ("Plaintiff does not allege that the TikTok Software records only IP addresses. Instead, Plaintiff alleges that the TikTok Software recorded various other types of information such as browser and device data as well as form data."); FAC ¶¶ 2, 30-32, 82-83, 87-88, 97-98, 109-110, 138. "Defendant does not argue that the collection of this data is necessary to operate or maintain the Website." *Moody*, 742 F. Supp. 3d at 1077. "Nor does Defendant argue that the collection of any data by a third party is necessary." *Autotrader.com*, 762 F. Supp. 3d at 930.

### B. Defendant Is Not A Provider Of An Electronic Communication Service, Nor Was The Installation Of The Third Party Trackers Necessary To Operate, Maintain, Or Test An Electronic Communication Service

Defendant also argues it is a "provider of [an] electronic communication service," and it was therefore permitted to install the Third Party Trackers to "operate, maintain, and test" its service. MTD at 14:6-7, 14:10-12 (citing Cal. Pen. Code § 638.51(b)). This is wrong.

For starters, "Defendant fails to establish that it is a provider of electronic or wire communication service." *Mirmalek*, 2024 WL 5102709, at *5 (cleaned up) (rejecting argument that the Los Angeles Times was a provider of an electronic communication).; *see also Zarif*, 2025 WL 486317, at *12 (pharmacy that operated website "fail[ed] to establish it meets [the] definition" of a provider of an electronic communications service). While CIPA does not define "electronic communications service provider," California's Electronic Communications Privacy Act does define both "electronic communications service" and "service provider":

> "Electronic communication service" means a service that provides to its subscribers or users the ability to send or receive electronic communications, including any service that acts as an intermediary in the transmission of electronic communications, or stores electronic communication information.
>
> "Service provider" means a person or entity offering an electronic communication service.

Cal. Penal Code §§ 1546(e), 1546(j). This term plainly refers to companies like Xfinity that provide access to the Internet or operate telephonic services. But by Defendant's own admission, the Website is "a tech news blog about technology, science[,] and internet culture." MTD at 14:2. And the Third Parties are data brokers (or work with data brokers) that participate in the selling of user information through real-time bidding. *See*, *e.g.*, FAC ¶¶ 117, 123, 131. Thus, Defendant cannot show that either it or the Third Parties provided an "electronic communication service."

Even if Defendant is a provider of an electronic communication service (and it is not), the installation of a "pen register" is only be permitted under limited circumstances. Here, Defendant argues those circumstances are "[t]o operate, maintain, and test a wire or electronic communication service" and with Plaintiff's consent. MTD at 14:12-15, 15:4-5; *see also* Cal. Pen. Code §§ 638.51(b)(1), (b)(5). Addressing consent first, Defendant has not shown that Plaintiff consented to the collection of his IP address and other information by the *Third Parties* just by using the Website, nor can it. Argument § III.A., *supra*; *Shah*, 754 F. Supp. 3d at 931; *Heiting*, 2025 WL 736594, at *4. Indeed, Plaintiff alleges that IP addresses were "copied into the Steamrail [and AGKN] Tracker[s], meaning Defendant affirmatively chose for ironSource [and Neuster] to collect the IP address," rather than it being a necessary part of website communications. FAC ¶¶ 90, 100. And whether Defendant *itself* collected Website users' information is immaterial to whether Plaintiff and Website users consented to letting the Third Parties do the same (they did not). Argument § III.A., *supra*; *Shah*, 754 F. Supp. 3d at 931; *Autotrader.com*, 762 F. Supp. 3d at 930.

It also does not matter that Plaintiff is a "regular user of" the Website. MTD at 15:1-2. "Repeated use of a website or mobile application does not contribute to" a finding of consent, especially where, as here, Defendant has submitted no evidence that Website users were on "constructive notice" of any policy disclosing the conduct. *See Benson v. Double Down Interactive,*

*LLC*, 798 F. App'x 117, 119 (9th Cir. 2020). All it means is that Plaintiff repeatedly had his information collected by the Third Parties—as caused by Defendant—without Plaintiff's notice or consent. Last, Defendant's own consent to the conduct is equally irrelevant, as such a scheme "would absolve many actors from liability under CIPA based on their self-serving consent to the use of pen registers they installed or caused to be installed." *Lesh*, 2025 WL 563358, at *5.

As to operating and maintaining an electronic communication service, Defendant discusses its own collection of IP addresses as necessary to maintain its Website. MTD at 14:12-15. Again, this is irrelevant to whether it was necessary for the *Third Parties* to collect Plaintiff's IP address, much less his other identifiers. Argument § III.A., *supra*; *see also Moody*, 742 F. Supp. 3d at 1076-77. And the Third Parties have nothing to do with operating and maintaining Defendant's Website. As Defendant admits, it installed the Third Party Trackers to improve "the effectiveness of its marketing." MTD at 13:3. And as Plaintiff alleges, the Third Parties are registered data brokers that participate in the selling of Website users' personal information to advertisers. *See*, *e.g.*, FAC ¶¶ 79-81, 117-136. To wit, Defendant is installing the Third Party Trackers—and the Third Parties are collecting users' IP addresses and other identifiers—to de-anonymize and identify users by matching these identifiers to the Third Parties' comprehensive identity graphs, all of which increases the value of users' data when sold in real-time bidding auctions. *Id.* ¶¶ 54-55, 74-75, 79-81, 86, 96, 108, 120, 122, 125, 127-136, 138-139. None of this has to do with the basic functionality of the Website, and the exception therefore does not apply. *Cf. In re Hulu Privacy Litig.*, 2012 WL 3282960, at *6-7 (N.D. Cal. Aug. 10, 2012) (finding disclosures to third-party "online market research, ad network and web analytics companies" fell outside of "ordinary course of business" exception to the Video Privacy Protection Act). To the extent Defendant challenges the purposes for which it installed the Trackers of data brokers on Website users' browsers, "that factual issue is not appropriate for resolution on a motion to dismiss." *Jackson v. Fandom, Inc.*, 2023 WL 4670285, at *5 (N.D. Cal. July 20, 2023).

## IV. THIS ACTION SHOULD NOT BE STAYED BASED ON STRONGLY OPPOSED BILL THAT MAY NOT PASS IN ITS CURRENT FORM (IF AT ALL)

Absent a persuasive argument in favor of dismissal, Defendant asks this Court to "stay this action pending the California State Legislature's pending decision on SB690." MTD at 20:13-14. This is so, Defendant contends, because SB690 would "exclude Defendant's alleged conduct as constituting a 'pen register' under CIPA." *Id.* at 17:12-14. Yet, courts do not stay actions based on proposed legislation. Indeed, "[i]f courts were to stay actions every time new legislation was introduced the judicial system would grind to a halt." *Droesch v. Wells Fargo Bank, N.A.*, 2021 WL 1817057, at *6 (N.D. Cal. May 6, 2021); *Jackson v. Hill*, 2021 WL 12301887, at *2 (C.D. Cal. Oct. 20, 2021) ("The Court finds that this pending legislation is too tenuous to form a basis to stay the [petition]."). And Defendant "cites no legal authority for [its] suggestion that pending legislation should entitle [it] to a stay." *Venckiene v. United States*, 929 F.3d 843, 864 (7th Cir. 2019). Nor can it, because "[f]ederal courts apply duly enacted laws; they do not try to guess which bills may or may not be enacted into law." *Id.*

SB690 is a perfect example of why Defendant's argument is flawed. As written, the bill does not alter the definition of a "pen register" (*i.e.*, Defendant's conduct still falls within the statute's scope). Instead, it proposes to add a retroactive "commercial business purposes" exemption to the CIPA potentially carve out conduct like Defendant's.[9] But although voting for the bill to pass through the Public Safety Committee, several senators expressed great concerns regarding the retroactivity language, as well as balancing the interests of small businesses with reigning in large technology companies, a nuance not allowed for by the bill's current draft. *See* SENATE STANDING COMMITTEE ON PUBLIC SAFETY, Remarks by Sen. Scott Weiner at 24:45 ("I'm very interested in seeing the retroactivity come out … I think some of the big tech companies are more likely to engage in practices that I think a lot of us object to in terms of people's privacy … So those are just the two issues that I'm going to be looking at as this Bill moves forward.")[10]; *id.*, Remarks by Sen. Sasha

---

[9] SB 690: CRIMES: INVASION OF PRIVACY, https://calmatters.digitaldemocracy.org/bills/ca_202520260sb690

[10] Available at https://calmatters.digitaldemocracy.org/hearings/258956?t=1484&f=a705613762a9470e2b716124efd7f48a.

Perez ("I also wanted to … raise the same concerns … around both retroactivity but also making it so that this doesn't protect some of these really big tech companies.").[11] And, of course, the bill must not only pass before the full California State Senate, but also before the California State Assembly, where the bill will and has encountered stern opposition from both consumer protection and consumer privacy groups.[12] During this time, the bill may be amended to add or remove language, if it passes at all. So, there is no guarantee that SB 690 will pass, and even if it does, that it will look the way the bill currently does.

In sum, Defendant seeks to stay this action based on a bill that may *hypothetically* pass this year (if ever), that may *hypothetically* have the same language as its current form, and may *hypothetically* exempt Defendant's conduct if it passes in its current form. But, as every child who grew up watching *Schoolhouse Rock* knows, SB690 is not a law, but "just a bill."[13] And a bill is not a basis to stay this action.

## V. TO THE EXTENT THE COURT GRANTS THE MOTION (AND IT SHOULD NOT), PLAINTIFF SHOULD BE PERMITTED LEAVE TO AMEND

Should the Court grant Defendant's Motion (which it should not), Plaintiff respectfully requests leave to amend. Despite Defendant's assertion that Plaintiff's claim is futile (which it is not), the Ninth Circuit has consistently granted plaintiffs leave to amend regardless of multiple previously amended pleadings. *See Roney v. Miller*, 705 F. App'x 670, 671 (9th Cir. 2017) (holding lower court erred in denying leave to amend after dismissing first amended complaint); *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1183 (9th Cir. 2016) (reversing denial of leave to amend even though the plaintiff had previously amended his pleading three times). This is especially true where, as here, the Court has not yet ruled on the merits of Defendant's arguments or Plaintiff's allegations.

---

[11] Available at https://calmatters.digitaldemocracy.org/hearings/258956?t=1574&f=a705613762a9470e2b716124efd7f48a.

[12] SB 690: CRIMES: INVASION OF PRIVACY, https://calmatters.digitaldemocracy.org/bills/ca_202520260sb690.

[13] SCHOOLHOUSE ROCK, I'M JUST A BILL (1975), https://www.youtube.com/watch?v=SZ8psP4S6BQ.

Furthermore, the Ninth Circuit has emphasized that "[u]nder futility analysis, dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011) (cleaned up); *see also Lopez v. Smith,* 203 F.3d 1122, 1130 (9th Cir. 2000) (noting that a court should permit amendment "unless it determines that the pleading could not possibly be cured by the allegation of other facts"). Here, it is at worst far from certain that Plaintiff's claim is futile. As noted throughout this brief, numerous courts have sustained claims similar to those here, and even without allegations related to data brokers and real-time bidding. Thus, should the Court grant Defendant's Motion (and it should not), Plaintiff respectfully requests leave to amend to cure defects in the allegations.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion. If the Court grants the Motion in any respect, Plaintiff respectfully requests leave to amend.

Dated: May 20, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Emily A. Horne*
Emily A. Horne

L. Timothy Fisher (State Bar No. 191626)
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
ehorne@bursor.com

*Attorneys for Plaintiff*